IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-810

Filed: 17 March 2020

Macon County, No. 16 CRS 50976

STATE OF NORTH CAROLINA

v.

DAVID WARREN TAYLOR, Defendant.

Appeal by Defendant from judgment entered 23 January 2018 by Judge Gary M. Gavenus in Superior Court, Macon County. Heard in the Court of Appeals 11 April 2019.

*Attorney General Joshua H. Stein, by Solicitor General Matthew W. Sawchak and Solicitor General Fellow Matthew C. Burke, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Aaron Thomas Johnson, for Defendant.*

McGEE, Chief Judge.

David Warren Taylor ("Defendant") was convicted on 23 January 2018, pursuant to N.C.G.S. § 14-16.7(a) (2017) ("N.C.G.S. § 14-16.7(a)" or "the statute"), of "Threatening to Kill a Court Officer," Macon County District Attorney Ashley Welch ("D.A. Welch"). In *Watts v. United States*, the United States Supreme Court held the First Amendment required that, in order to constitutionally convict a defendant pursuant to an anti-threat statute, the government had to prove that the "threat" alleged constituted a "true threat":

> [T]he [anti-threat] statute . . . requires the Government to prove a true "threat." We do not believe that the kind of political hyperbole indulged in by [the defendant] fits within that statutory term. For we must interpret the language Congress chose "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." The language of the political arena . . . is often vituperative, abusive, and inexact.

*Watts v. United States*, 394 U.S. 705, 708, 22 L. Ed. 2d 664, 667 (1969) (citation omitted).

In this case, the alleged threats were included in several Facebook comments Defendant posted to his personal Facebook page on 24 August 2016, between approximately 5:30 p.m. and 6:30 p.m. These posts were visible to Defendant's Facebook friends for one to two hours until Defendant deleted them. However, one of Defendant's Facebook friends, Detective Amy Stewart ("Detective Stewart") of the Macon County Sheriff's Office, who was also a friend of D.A. Welch, saw Defendant's comments and took screenshots of some of the posts before they were deleted by Defendant. Detective Stewart shared the screenshots with the Macon County Sheriff (the "sheriff") and D.A. Welch. The sheriff contacted the North Carolina State Bureau of Investigation ("SBI") that evening, and the SBI became the investigative body in this matter. Based primarily upon a comment Defendant made in one of his posts that "[i]f our head prosecutor won't do anything then the death to her as well[,]"

Defendant was charged with threatening a court officer pursuant to N.C.G.S. § 14-16.7(a). At trial, Defendant requested a jury instruction on the First Amendment requirement, as determined by the Supreme Court in *Watts* and subsequent opinions, that a person cannot be charged or convicted under an anti-threat statute unless the State proves that the alleged threat constituted a "true threat." Defendant's motion was denied, and he was convicted.

Defendant appealed and makes an "as applied" constitutional challenge to N.C.G.S. § 14-16.7(a), alleging "the trial court erred in failing to dismiss the charge" because the State failed to prove the "true threat" element of the statute as required by the First Amendment. In addition, Defendant argues that "the trial court erred in failing to instruct the jury on the definition of a true threat[,]" also in violation of the First Amendment. Because we find that N.C.G.S. § 14-16.7(a) was applied to Defendant in violation of his First Amendment rights, we vacate his conviction.

I. <u>Factual and Procedural Background</u>

Defendant was indicted on 19 September 2016 for violation of the statute, which states in relevant part: "Any person who knowingly and willfully makes any threat . . . to kill any . . . court officer . . . shall be guilty of a felony[.]" N.C.G.S. § 14-16.7(a). The indictment included five quotes from Defendant's Facebook comments:

> [D]efendant . . . did knowingly and willfully make a threat to kill [D.A. Welch], . . . by posting the following on Facebook: "[P]eople question why a rebellion against our government is coming? I hope those that are friends with

her share my post because she will be the first to go. . . . I will give them both the mtn justice they deserve . . . [.] If our head prosecutor won't do anything then the death to her as well. . . . [I]t is up to the people to administer justice! I'm always game to do so. They make new ammo everyday! . . . It is time for old Time mtn justice!"[1]

Defendant was tried on 23 January 2018. Detective Stewart testified at trial that Defendant and D.A. Welch were friendly acquaintances prior to the events of 24 August 2016, which led to Defendant's conviction. Defendant worked for an investment and insurance company in an office next to the Macon County Courthouse. Defendant and D.A. Welch saw each other daily in a common outdoor smoking area shared by employees at Defendant's office building and the courthouse. Detective Stewart also used the same smoking area. Defendant's interactions with both women were always polite, and D.A. Welch testified that Defendant's favorite topic of conversation seemed to be politics. Detective Stewart testified that she and Defendant "had some of the same political beliefs and so we were friends on Facebook." She testified that on the evening of 24 August 2016, between 5:00 p.m. and 6:00 p.m., she signed on to Facebook and noticed some posts by Defendant that troubled her. Detective Stewart testified that Defendant's "initial post was about him being upset about a decision by the D.A.'s office with a case regarding a baby [(the

---

[1] The Facebook posts contain some common messaging shorthand substitutes for words, as well as loose punctuation and capitalization. We include them as they were written, taken from the State's screenshot exhibits, instead of reproducing them from the transcription of Detective Stewart's testimony. The posts from Defendant's Facebook friends were not read by Detective Stewart, so they are also quoted from the screenshots.

'child')] that had died. [T]here were no charges being brought [by D.A. Welch] against the parents [(the 'parents')], so he was upset about that."

Defendant's first post referenced the fact that the parents were not going to be prosecuted by D.A. Welch, addressed his belief that the "judicial system" was not working, and expressed his frustration that "[w]ith this [decision not to prosecute] people question why a rebellion against our government is coming? I hope those that are friends with her share my post because she will be the first to go, period and point made." Some of Defendant's Facebook "friends" responded to this post, and a "conversation" between Defendant and these friends ensued, which included disparaging remarks about D.A. Welch, politicians, the local justice system, and law enforcement officers. This Facebook conversation occurred in the time period between 5:30 p.m. and 6:30 p.m. Detective Stewart testified that she saw this conversation no later than 6:00 p.m. and, approximately an hour and a half later, she decided to take screenshots of some of the comments. The screenshots indicate that they were taken at approximately 7:30 p.m. Along with screenshots of some of the exchange between Defendant and his Facebook friends regarding the decision not to prosecute the parents, Detective Stewart also took screenshots of Defendant's Facebook profile, which included a large picture of John Wayne and a quote attributed to John Wayne stating: "Life is hard; it's harder if you're stupid." A smaller picture of Defendant's profile consisted of an American flag background with

part of the "Gadsden" flag which includes a coiled snake and the first two words of the "Don't Tread on Me" slogan. Defendant's profile information also indicated that Defendant had attended Franklin High School, and that he was an Army veteran.

Detective Stewart testified that, after taking the screenshots, she called D.A. Welch and the sheriff to inform them about the comments. Detective Stewart also forwarded the screenshots to D.A. Welch and the sheriff. D.A. Welch contacted her office and informed her Chief Assistant D.A. of Detective Stewart's concerns; the matter was referred to the SBI that evening. Detective Stewart went back on Facebook an "hour or two" after capturing the screenshots, and Defendant's posts were no longer there, having been deleted by Defendant.

The following day, at approximately 1:25 p.m., SBI Special Agent Joel Schick ("Agent Schick") and another agent went to Defendant's workplace to interview him about his Facebook posts. Following the interview, Agent Schick left Defendant at Defendant's workplace, then returned to Defendant's office at approximately 3:20 p.m. with a warrant for Defendant's arrest, which stated there was probable cause to believe Defendant "knowingly ma[de] a threat to kill . . . [D.A. Welch], by posting 'If our head prosecutor won't do anything then the death to her as well'" on his Facebook page.

Early in Defendant's trial, Defendant objected as the State was attempting to introduce five of Defendant's Facebook comments through the testimony of Detective

Stewart. Detective Stewart and Agent Schick were questioned on *voir dire*, and Defendant argued (1) that none of the Facebook posts should be admitted due to authentication issues and, (2) in the alternative, if any of the posts were admitted, all of the posts should be admitted to provide context. The State argued that only the five posts it had chosen should be admitted, and the rest should be suppressed as hearsay, and because they were "irrelevant" to Defendant's charges. The trial court ruled against Defendant on the authentication argument, and the discussion then centered on whether to admit some or all of the posts captured by Detective Stewart's screenshots. The State argued the additional posts should not be admitted, dismissing Defendant's argument that the alleged threat had to be proven based upon its context: "We believe those are the five relevant texts. It's the State's position that the other texts . . . are not relevant."

> [THE STATE:] I don't think the other conversations are relevant. There's no exception to the statute for communicating threats if you're involved in a conversation with other people that are equally upset. The question is under the elements and under the statute did [D]efendant threaten to kill [D.A. Welch]. The context of that conversation is not relevant[.] And the State would argue that . . . it's not relevant. There is no, like I said, justification for your threat to kill[.]

Defendant responded that the other posts were "clearly relevant to [Defendant's] [free] speech" argument:

> [The additional posts] are relevant on the issue of whether or not this is a true threat under various United States

> Supreme Court decisions[.] I know the District Attorney characterizes this as a threat, but when you look at all these things, you don't see anything where my client said, "I'm going to kill the District Attorney." So . . . it falls under the definition of a true threat as to whether or not it's even a threat. And when you look at the definition of a true threat, there has to be a communication showing a serious intent to cause harm to [D.A. Welch]. That's the standard. And without seeing what these other posts are saying, there's no way for the jury to get a full view of what's going on here.

At trial, the State had Detective Stewart read the five Facebook posts that it had selected, which were marked as State's Exhibits 1 through 5 ("State's Exhibits 1 – 5"), which Detective Stewart described as "parts of the screen shots that I took with just [Defendant]'s posts and comments without the other people that responded." Two of the five posts introduced by the State did not include any statements contained in Defendant's indictment, and the post including the "old Time mtn justice!" comment was not included in State's Exhibits 1 – 5. From the record and statements of Defendant's attorney, it does not appear that Detective Stewart took screenshots of all the posts and comments from the Facebook discussion relevant to this case. Further, according to *voir dire* testimony, there were seven people, in addition to Defendant, whose comments *were* included in Detective Stewart's screenshots, but the comments of only four of them are included in the record. An eighth person, J. Drake, is identified as having "liked" Defendant's initial post.

At trial, Detective Stewart was asked to read the five selected posts, State's Exhibits 1 – 5, one immediately after the other, without discussing any of the additional comments. On cross-examination, Detective Stewart read at least some of the additional posts contained in Detective Stewart's screenshots. During direct examination, Detective Stewart was asked to read State's Exhibits 4 and 5 out of the chronological order in which they were posted by Defendant. We present State's Exhibits 1 – 5, along with the additional comments captured in Detective Stewart's screenshots, in the proper chronological order of their posting. The comments in State's Exhibits 1 – 5 that were included in Defendant's indictment are underlined. State's Exhibit 1, which was Defendant's initial post, stated:

> So I learned today that the couple Who brought their child Into that er whom had been dead to the point that the er room had to be closed off due to the smell of the dead child Will face no Charges. I regret the day I voted for the new DA with this outcome. This is totally sickening to know that a child, Whether by [D.A.] Ashley Welch's decision or not is not granted this type of Protection in our court system. Im tired of standing back and seeing how our judicial system works. I voted for it to change and apparently it never will. With this people question why a rebellion against our government is coming? I hope those that are friends with her share my posts because she will be the first to go, period and point made

(Emphasis added). This post had six "emoji" responses and thirteen comments at the time Detective Stewart took the screenshot. All of the emoji responses and comments by Defendant's Facebook friends in the record expressed some level of agreement with

Defendant's statements.  Detective Stewart then testified that Defendant "continued posting about how he was upset about that decision and negative things about" D.A. Welch.

Detective Stewart next read State's Exhibit 2:

> Sick is not the word for it.  This folks is how the government and the judicial System works,  Now U wonder why I say if I am raided for whatever reason like the guy on smoke rise was.  When the deputy ask me is it worth it.  I would say with a Shotgun Pointed at him and a ar15 in the other arm was it worth to him?  Who cares what happens to the person I meet at the door.  I'm sure he won't.  I would open every gun I have.  I would rather be carried by six than judged by twelve.  This folks is how politicians want u to believe is okay.  I'm tired of it.  What I do Training wise from this point is ur fault.  And yes I know I have friends on fb whom see this.  I hope they do!  Death to our so called judicial system since it only works for those that are guilty!  U want me come and take me

This post had two "likes" at the time of the screenshot.  Nothing from this post was included in Defendant's indictment.  In response to this comment, someone named R. Burch ("Burch") responded "vigilante justice !!!!!!!!!!!!!!!!!!!!!![,]" which had one "like." A man identified as D. Sammons commented:  "I wouldn't expect that from Franklin but maybe Asheville."  Defendant responded:  "**D[.] Sammons** she doesn't serve the Asheville city, only west of there.  Haywood county to the tn state line.  This is how politics works.  That's why my harsh words to her and any other that will Listen and

share it to her fb page."[2]  A woman identified as J. Crossman posted: "Poor little guy, he didn't get any justice.  Ashley [(D.A. Welch)] can you give your County Citizens that you represent any answers?  Please."[3]

Immediately following State's Exhibit 2, Detective Stewart read State's Exhibit 3:

> If that what it takes **R[.] Burch**.  <u>I will give them both the mtn justice they deserve</u>.  Regardless of what the law or courts say.  I'm tired of this political bullshit.  <u>If our head prosecutor won't do anything then the death to her as well</u>.  Yeah, I said it.  Now raid my house for communicating threats and see what they meet.  After all those that flip Together swim together.  Although this isn't a house or pond they want to fish in.

(Emphasis added).  This post had one "like."  Burch then posted: "I'm still waiting."

Detective Stewart next read State's Exhibit 4, even though it was posted after State's

Exhibit 5.  Therefore, we quote State's Exhibit 5 next:

> For what **R[.] Burch**?  Her to reply?  She won't because she is being paid a 6 digit income standing Outside the courthouse smoking a cigarette.  She won't try a case unless it gets her tv time.  Typical politician.  Notice that none of them has responded yet?  Although I'm sure My house is being Monitored right about now!  I really hope They are ready for what meet them at the front door.  Something tells Me they aren't!

---

[2] Names included in a post that show up in bold mean that person was "tagged" in the post. When a person is tagged in a post, that person will get a notification informing them of this fact and be provided a link directly to the associated post.

[3] Again, these additional posts were not included in State's Exhibits 1 – 5, and the State did not have Detective Stewart read these posts into evidence; Defendant had Detective Stewart read them to the jury on cross-examination.

This post did not include any comments that were in Defendant's indictment. Burch then posted: "I'm waiting on you boys to say it's time to go!!!!!!!!!!!!!!!!" This post was followed by a large "laughing" emoji also posted by Burch. These posts were not read by Detective Stewart on direct examination. Detective Stewart read State's Exhibit 4 last, in which Defendant stated:

> It can start at my house. Hell this has to start somewhere. If the courts won't do it as have been proven. Then yes <u>it Is up to the people to administer justice! I'm always game to do so. They make new ammo everyday!</u> Maybe you need to learn what being free is verse being a puppet of the government. If u did u might actually be happy! I think we both know of someone who will like this Comment Or Like this post.

(Emphasis added).

On cross-examination, Defendant asked Detective Stewart to read the posts not introduced in her direct examination, being the non-State's Exhibit posts included above, as well as the posts that follow. A woman identified as S. Marion commented: "I know people who said the ER room had to be shut down because the smell of the dead kid stunk up the entire ER room. Our DA and police department chose not to press charges. Yea that's the facts. Welcome to America. The once great great nation." Defendant responded to this post with the following two comments:

> Don't get me started on this. The court system and Most importantly western nc justice system is useless. It's all about money to the courts than it is about justice. <u>It is time for old Time mtn justice!</u> Yes **R[.] Burch** I said it. Now let Them knock on my door

> **R[.] Burch** don't get me Started about The Tony Curtis killing. Of Course No charges will Be brought against him. He is what the county considers to be a upstanding citizen of the community. Typical politics at its best. What he did was no different to the killing On 411 North over a year ago. What was his name? Fouts?

(Emphasis added). Although this second mention of "mountain justice" is included in the indictment, it was not included in State's Exhibits 1 – 5. Detective Stewart testified that "Tony Curtis" and "Fouts" referenced homicide cases handled by the D.A.'s office. This last post appears to be in response to a comment not included in the record.

Detective Stewart testified she knew Defendant had an office next to the courthouse. She and Defendant would see each other on a regular basis in a common smoking area outside the offices, and that D.A. Welch also frequently smoked in the same area. Detective Stewart never noticed any problems between Defendant and D.A. Welch.

D.A. Welch testified that she saw Defendant "pretty frequently on a daily basis" because they worked in adjacent buildings and both used the smoking area. She testified that Defendant "[n]ever said anything that [she] considered to be threatening" and that he was "always polite with" her. D.A. Welch also stated that Defendant was "real political," so their conversations were "usually political speech." D.A. Welch testified that she did not change her smoking habits or the location of her

smoke breaks as a result of Defendant's Facebook posts. She testified that she did request that her real estate agent take down a video tour of her home "so that it wasn't so easy to figure out where I lived." However, she declined the sheriff's offer to have "somebody come out" that night to watch her house, and neither "the Sheriff's Department [n]or the SBI [] dispatch[ed]" officers "out to [her] house to sit[.]" The next morning, 25 August 2016, D.A. Welch went to the courthouse as usual. She testified the only difference she noticed was more "sheriff officers from civil process" around the courthouse than was normal, so she "apologized to them" and "kept telling them I'm okay, you know, you don't have to –[,]" at which point the State asked a different question. She was unaware of any security provided for her outside the courthouse, and she had not "heard from [D]efendant since that night[.]"

Agent Schick, the first law enforcement officer to contact Defendant about the Facebook posts, arrived at Defendant's office on 25 August 2016 at approximately 1:25 p.m. He testified that Defendant was "polite" and "courteous" and answered all his questions. Defendant told Agent Schick that he started cooking hamburgers for his family around 5:00 p.m.; drank approximately six beers during the evening; made the post about D.A. Welch's decision not to prosecute the parents of the child who had died, and engaged in the resulting Facebook conversation; but that he deleted the posts between 7:00 p.m. and 8:00 p.m. Defendant told Agent Schick that "he could not believe no charges were brought against the parents for neglect and felt this was

sickening[,]" and that "[i]f it were me, charges would have been brought against me." Defendant stated that "he would not threaten to kill a public official and knew this was against the law[.]"

Defendant "told [Agent Schick] that he took the Facebook [posts] down because he did not want people to think he was threatening anyone or taking things the wrong way[,]" and he also would not want his posts to somehow get back to the "child's parents." Defendant had deleted his posts within a couple of hours of having posted them. Defendant then told Agent Schick that he would never threaten anyone unless "they threatened my kids or family or trespass on my property." Defendant emphatically stated to Agent Schick that "he knew . . . for sure" that he did not "threaten to kill someone"; "nor did he mean to threaten anyone"; and "that he had no intention of making anyone feel threatened and that was the last thing that he wanted to do[.]" Defendant asked Agent Schick to apologize to D.A. Welch when he next saw her, and to let her know Defendant had not intended to make her feel threatened.

As far as Agent Schick knew, no law enforcement agency was "keeping an eye on [Defendant] because of the[] posts[,]" and no search was ever conducted of Defendant's house, office, or car. Defendant was left unsupervised after Agent Schick questioned him until Agent Schick returned with a warrant for Defendant's arrest at approximately 3:20 p.m., when Defendant was taken into custody without resistance.

There is no record evidence that any attempt was made to confiscate Defendant's firearms during the nearly one-and-a-half-year period between when Defendant posted the above comments and when he was convicted for having done so.

Defendant moved to dismiss at the close of the State's evidence, and Defendant did not present any evidence. Defendant's motion to dismiss was based on the requirement of the First Amendment that an anti-threat statute such as N.C.G.S. § 14-16.7(a) must be read as requiring proof of a "true threat" as defined by the United States Supreme Court. Defendant argued: "When you look at the cases concerning free speech, the test is [considering] the context . . . is this a true threat. The definition of that is, is this a statement in which the defendant means to communicate a serious intention of committing an act of unlawful violence against a particular person[.]" The State contested Defendant's argument that First Amendment "true threat" jurisprudence placed any additional burden on the State, contending: "Your Honor, the elements of the charge . . . [are] did [D]efendant threaten to kill [D.A. Welch]. Is [D.A. Welch] a court official, and did he know she was the District Attorney. The State through its evidence has presented evidence as to all three of those matters." The trial court then ruled: "I have considered the motion and certainly taken in the light most favorable to the State, there's evidence of each and every element of the crime. The motion is denied."

At the charge conference, Defendant requested an instruction on "true threat," arguing that the First Amendment required such an instruction. The State objected to the requested instruction, arguing that the First Amendment did not require any "true threat" or intent elements be added to the plain language of the statute: "The State would object to all these instructions[.] The pattern jury instructions are clear that there are three and only three elements to this charge. Now with regards to the threat, the only element is that the defendant knowingly and willfully made a threat to kill the victim." The State further argued that the First Amendment did not apply to Defendant's case: "I get that the defendant is raising First Amendment objections to that statute as it's written, but I think the proper venue to take that up would be if upon conviction to take that up on appeal." "Therefore, it is the legislature's intent . . . that there be no requirement of proof to show that the threat was made in a manner and under circumstances which would cause a reasonable person to believe it is likely to be carried out." "[M]aking any threats towards . . . court officials . . . is unacceptable to the legislature, regardless of whether they were made in a manner that a reasonable person would believe they would be carried out." The trial court denied Defendant's requested instruction, and Defendant was found guilty of threatening to kill D.A. Welch pursuant to N.C.G.S. § 14-16.7(a) on 23 January 2018. Defendant was sentenced to six to seventeen months' imprisonment, which was

suspended, and Defendant was placed on twenty-four months' supervised probation. Defendant appeals. Additional facts will be included in our analysis.

## II. First Amendment

Defendant's arguments are based upon allegations that his conviction was in violation of the First Amendment, which generally "prevents government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed. Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 120 L. Ed. 2d 305, 317 (1992) (citations omitted). The Supreme Court's interpretation of the First Amendment "has permitted restrictions upon the content of speech in a few limited areas, which are 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" *Id.* at 382–83, 120 L. Ed. 2d at 317 (citations omitted). Although the Court has referred to the categories of speech that may be restricted without implicating the First Amendment as constitutionally "unprotected" speech and said that "the 'protection of the First Amendment does not extend' to them," *id.* at 383, 120 L. Ed. 2d at 317 (citations omitted), the Court has clarified

> that these areas of speech can, consistently with the First
> Amendment, be regulated *because of their constitutionally
> proscribable content* (["true threat,"] obscenity, defamation,
> etc.)—not that they are categories of speech entirely
> invisible to the Constitution, so that they may be made the
> vehicles for content discrimination unrelated to their

> distinctively proscribable content. Thus, the government
> may proscribe libel; but it may not make the further
> content discrimination of proscribing *only* libel critical of
> the government.

*Id.* at 383–84, 120 L. Ed. 2d at 318 (citations omitted) (emphasis in original). "The government may not regulate use [of traditionally proscribable speech] based on hostility—or favoritism—towards the underlying message expressed." *Id.* at 386, 120 L. Ed. 2d at 320 (citations omitted). There are a limited number of categories of potentially proscribable speech, "[a]mong these categories are advocacy intended, and likely, to incite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words;' child pornography; fraud; [and] true threats[.]" *United States v. Alvarez*, 567 U.S. 709, 717–18, 183 L. Ed. 2d 574, 586–87 (2012) (citations omitted); s*ee also Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 297, 749 S.E.2d 429, 435 (2012). For simplicity, we will refer to these categories of speech as proscribable, or "unprotected" speech, even though that characterization is not entirely accurate. As will be discussed below, "true threats" are a subset of "threats," as defined through First Amendment jurisprudence, which are of such a clearly "threatening" nature that their criminalization is not prohibited by the First Amendment, despite their normally expressive nature. *R.A.V.*, 505 U.S. at 382, 120 L. Ed. 2d at 317.

Defendant argues that in order for him to have been constitutionally prosecuted and convicted pursuant to N.C.G.S. § 14-16.7(a), the State was required

to prove his Facebook posts constituted not just "threats," but "true threats." Defendant further argues that the trial court was required to instruct the jury in accordance with First Amendment "true threat" jurisprudence. However, review of Defendant's arguments is difficult because relevant issues regarding "true threats," and appellate review of issues involving "true threats," have yet to be settled by the courts of this State. We have only been able to locate four opinions by North Carolina appellate courts that mention "true threats" in the context of First Amendment protections: *State v. Bishop*, 368 N.C. 869, 787 S.E.2d 814 (2016), *State v. Shackelford*, __ N.C. App. __, __, 825 S.E.2d 689, 703 (2019) (mentioning that "true threats" are one of the recognized "unprotected" categories of speech), *State v. Mylett*, __ N.C. App. __, 822 S.E.2d 518 (2018) (currently before our Supreme Court on appeal of right due to dissent),[4] and *State v. Benham*, 222 N.C. App. 635, 731 S.E.2d 275, 2012 WL 3570792 (2012) (unpublished). Therefore, we look first to general First Amendment principles.

A. *As-Applied Challenge and General Principles*

Defendant makes only an as applied constitutional challenge to N.C.G.S. § 14-16.7(a): "An as-applied challenge contests whether the statute can be constitutionally applied to a particular defendant, even if the statute is otherwise generally enforceable." *State v. Packingham*, 368 N.C. 380, 383, 777 S.E.2d 738, 743 (2015)

---

[4] *Mylett* includes some issues that are related to those currently before this Court.

(citation omitted), *rev'd and remanded on other grounds*, __ U.S. __, 198 L. Ed. 2d 273 (2017). Therefore, we do not address whether N.C.G.S. § 14-16.7(a) is facially constitutional.

> The basic distinction is that an as-applied challenge represents a [defendant's] protest against how a statute was applied in the particular context in which [the defendant] acted or proposed to act, while a facial challenge represents a [defendant's] contention that a statute is incapable of constitutional application in any context. . . . Only in as-applied challenges are facts surrounding the [defendant's] particular circumstances relevant.

*Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016) (citations omitted), *aff'd per curiam*, 369 N.C. 722, 799 S.E.2d 611 (2017). In order for the statute to have been constitutionally applied to Defendant, it must have been applied in accordance with the limitations set by the First Amendment, *i.e.*, the trial court must have treated the statute as containing all required constitutional limitations, even if they were not contained in the plain language of the statute. *State v. Summrell*, 282 N.C. 157, 167, 192 S.E.2d 569, 575 (1972), *overruled on other grounds by State v. Barnes*, 324 N.C. 539, 380 S.E.2d 118 (1989) (citations omitted) ("[A] statute which defines proscribed activity so broadly that it encompasses constitutionally protected speech, cannot be upheld in the absence of authoritative judicial limitations."); *see also Stromberg v. California*, 283 U.S. 359, 369, 75 L. Ed. 1117, 1123 (1931).

On appeal, the State acknowledges that in order for N.C.G.S. § 14-16.7(a) to conform to the requirements of the First Amendment, it must be construed as limiting the term "threat" to "true threat."[5] *See United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012) ("*White I*") (citation omitted) ("[B]oth [the defendant] and the government agree that § 875(c) can only be violated if the interstate communication contains a 'true threat' to injure a person."). This is because the statute "restricts speech and not merely conduct." *Bishop*, 368 N.C. at 874, 787 S.E.2d at 818; *see also id.* at 876, 787 S.E.2d at 819 (defining a statute as "content based" if it "criminalizes some messages but not others, and makes it impossible to determine whether the accused has committed a crime without examining the content of his communication").

The freedom of citizens to express dissatisfaction with government action is at the core of the First Amendment. "'[The First] Amendment requires that one be permitted to believe what he will. It requires that one be permitted to advocate what he will unless'" his speech crosses over into the realm of "unprotected speech." *Dennis v. United States*, 341 U.S. 494, 508, 95 L. Ed. 1137, 1152 (1951) (alteration in original) (citation omitted). "Government may cut [speech] off only when [the speaker's] views are no longer merely views but threaten, clearly and imminently, to ripen into conduct against which the public has a right to protect itself." *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 395, 94 L. Ed. 925, 942 (1950).

---

[5] This position is contrary to the State's position at trial.

> The hallmark of the protection of free speech is to allow "free trade in ideas"—even ideas that the overwhelming majority of people might find distasteful or discomforting. Thus, the First Amendment "ordinarily" denies a State "the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence."

*Virginia. v. Black*, 538 U.S. 343, 358, 155 L. Ed. 2d 535, 551 (2003) (citation omitted).

Therefore, courts can, and must, if possible, read constitutional requirements into a statute when they are not expressly included, because "'impossible standards of statutory clarity are not required by the constitution. When the language of a statute provides an adequate warning as to the conduct it condemns and prescribes boundaries sufficiently distinct for judges and juries to *interpret and administer* it uniformly, constitutional requirements are fully met.'" *State v. Strickland*, 27 N.C. App. 40, 42–3, 217 S.E.2d 758, 760 (1975) (emphasis added) (citation omitted). However, in any individual prosecution, if a statute is not interpreted in accordance with constitutional requirements, or is not administered in accordance with those requirements, that statute will be considered unconstitutional as applied to the defendant in that prosecution. *Id.*; *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22, 80 L. Ed. 2d 772, 785 n.22 (1984) ("The fact that [a law] is capable of valid applications does not necessarily mean that it is valid as applied to [a particular defendant]."). We are guided by the requirement that "First Amendment standards . . . 'must give the benefit of any doubt to protecting rather

than stifling speech.'" *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327, 175 L. Ed. 2d 753, 773 (2010) (citation omitted).

The Supreme Court and North Carolina courts have developed a more comprehensive body of law in relation to other "unprotected" categories of speech than for "true threats." Because the Court regularly borrows from its reasoning and holdings concerning different "unprotected" categories of speech when deciding an issue concerning a particular "unprotected" category of speech, we will do the same. For example, in *Ashcroft v. Free Speech Coalition*, while reviewing an issue arising from a prosecution under an anti-child pornography statute, the Supreme Court looked to settled law from another "unprotected" category of speech, incitement to violent action:

> First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.
>
> To preserve these freedoms, and to protect speech for its own sake, the Court's First Amendment cases draw vital distinctions between words and deeds, between ideas and conduct. *See Bartnicki v[.] Vopper*, [532 U.S. 514, 529, 149 L. Ed. 2d 787, 803 (2001)] ("The normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it[.]"). The government may not prohibit speech because it increases the chance an unlawful act will be committed "at some indefinite future time." The government may suppress speech for advocating the use of force or a violation of law only if "such

> advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253, 152 L. Ed. 2d 403, 423 (2002) (citations omitted); *see also Black*, 538 U.S. at 359–60, 155 L. Ed. 2d at 552 (looking to incitement to violent action jurisprudence in support of the Court's "true threat" determination); *United States v. Bly*, 510 F.3d 453, 457–58 (4th Cir. 2007) (relying on standard of review set by the Supreme Court in a defamation case to determine standard in a "true threat" case).

In addition, the Supreme Court construes statutes that regulate speech narrowly, and proof of some level of intent is required for prosecution pursuant to an anti-threat statute. *Id.* In fact, First Amendment rights are often given *greater* protection than other constitutional rights:

> The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech . . . may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect.

*W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639, 87 L. Ed. 1628, 1638 (1943) (citations omitted). Therefore, a statute like N.C.G.S. § 14-16.7(a), "which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind[,]" *Watts*, 394 U.S. at 707, 22 L. Ed. 2d at 667, and "the commands of the First Amendment" are particularly strict. *Id.*; *Barnette*, 319 U.S. at 639, 87 L. Ed. at 1638; *see also United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011) ("Because the true threat requirement is imposed by the Constitution, the . . . test set forth in *Black* must be read into all threat statutes that criminalize pure speech."). If state-law standards conflict with constitutional requirements, the state law must give. The Supreme Court has held: "The standards that set the scope of [First Amendment] principles cannot therefore be such that 'the constitutional limits of free expression in the Nation would vary with state lines.'" *Rosenblatt v. Baer*, 383 U.S. 75, 84, 15 L. Ed. 2d 597, 605 (1966) (citation omitted).

Our Supreme Court also recognizes the principle that statutes which criminalize speech must be construed in accordance with the commands of the First Amendment. *See State v. Brooks*, 287 N.C. 392, 401, 215 S.E.2d 111, 118 (1975) (construing anti-incitement statute to conform to First Amendment requirements by holding that only speech constituting advocacy of "imminent lawless action," as defined in *Brandenburg v. Ohio*, 395 U.S. 444, 447, 23 L. Ed. 2d 430, 434 (1969), is proscribed by that statute); *see also Lewis v. Rapp*, 220 N.C. App. 299, 302–03, 725

S.E.2d 597, 601 (2012); *Varner v. Bryan*, 113 N.C. App. 697, 703, 440 S.E.2d 295, 299 (1994) (stating rule that the First Amendment requires proof of "actual malice" element in a case of defamation against a public official).

The right of citizens to criticize public officials is at the heart of First Amendment protections: "If the First Amendment has any force, it prohibits Congress from fining or jailing citizens . . . for simply engaging in political speech." *Citizens United*, 558 U.S. at 349, 175 L. Ed. 2d at 788.

> [A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content. *Cohen v. California*, [403 U.S. 15, 24, 29 L. Ed. 2d 284, 293 (1971) (and many additional cases cited)]. . . . Any restriction on expressive activity because of its content would completely undercut the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, [376 U.S. 254, 270, 11 L. Ed. 2d 686, 701 (1964)].

*Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95, 33 L. Ed. 2d 212 (1972) (citations omitted). For this reason, review "of content restrictions must begin with a healthy respect for the truth that they are the most direct threat to the vitality of First Amendment rights." *Id.*

In addition, the freedom to associate with like-minded people and exchange ideas, as well as the freedom to express unpopular ideas in a public forum, are fundamental rights under the First Amendment:

> An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed. . . . [W]e have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

*Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 82 L. Ed. 2d 462, 474 (1984) (citations omitted); *Packingham v. North Carolina*, 582 U.S. __, __, 198 L. Ed. 2d 273, 279 (2017) ("A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more."). Particularly relevant to Defendant's case: "While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Id.*

In *Alexander v. United States*, the court discussed how *Watts*, the first Supreme Court opinion recognizing the First Amendment's "true threat" requirement for anti-threat statutes, served to limit the expansive reach that federal circuit courts had given to anti-threat statutes:

> *Watts* represented the Supreme Court's first construction of [an anti-threat statute—18 U.S.C. § 871(a)], an endeavor in which various other federal courts had engaged. Some of these courts, on whose holdings the majority of [the D.C. Circuit opinion in *Watts*] relied, had expanded the concept

> of a "threat" so broadly as to include utterances employing violent words intended and understood as mere jokes or political hyperbole. The Supreme Court, however, admonished that "we must interpret the language Congress chose 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" Thus, ruled the Court, to support a conviction under the statute, "the Government [must] prove a true 'threat.'"

*Alexander v. United States*, 418 F.2d 1203, 1205 (D.C. Cir. 1969) (footnotes omitted).

However, although *Watts* mandated than no anti-threat statute could be constitutionally applied unless its proscription of "threats" was limited to only "true threats," the Court left many important questions unanswered. The definition of "true threat" currently in use comes primarily from *Black*:

> Although the State cannot criminalize constitutionally protected speech, the First Amendment does not immunize "true threats." The Court held in [*Black*] that under the First Amendment the State can punish threatening expression, but only if the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."

*Bagdasarian*, 652 F.3d at 1116 (citations omitted). A "true threat" as defined in *Black* must be determined by looking at the context in which the alleged threat was made. *Id.* at 1119 (citation omitted) ("This . . . test requires the fact-finder to 'look[] at the entire factual context of [the] statements including: the surrounding events, the

listeners' reaction, and whether the words are conditional.' It is necessary, then, to determine whether [the defendant's] statements, considered in their full context, 'would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict bodily harm on or to take the life of [the person allegedly threatened].'").

Finally, it is not the defendant, but the government that bears "the burden of proving that the speech it seeks to prohibit is unprotected." *Illinois ex rel. Madigan v. Telemar. Assoc., Inc.*, 538 U.S. 600, 620 n.9, 155 L. Ed. 2d 793, 810 n.9 (2003) (citations omitted). "Where the First Amendment is implicated, *the tie goes to the speaker*, not the censor." *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 474, 168 L. Ed. 2d 329, 349 (2007) (emphasis added) (footnote omitted).

## B. *Unsettled Issues*

Beyond these general principles, there remain a number of issues relevant to this case that have not yet been decided by North Carolina appellate courts, including the following:[6] **(1) Review:** Does review of a defendant's conviction pursuant to an anti-threat statute require this Court to conduct "independent whole record" review. If yes, what does that review require. **(2) Elements**: Does "true threat" constitute an *element* of a criminal anti-threat statute, by inference if not expressly included,

---

[6] Some of these issues have been decided by the Supreme Court, but whether state courts, or even federal circuit courts, are bound by certain "true threat" related decisions of the Supreme Court is not always clear as application of these principles has not been universal.

that must be alleged in an indictment, proven beyond a reasonable doubt, and properly instructed to the jury; and is the requisite "intent," discussed below, whether specific, general, or both, also a necessary element of the anti-threat statute. **(3) Intent**: Does the First Amendment require the State to prove "objective intent," *i.e.*, that a defendant's alleged threat would be understood objectively, by a reasonable person familiar with the context, being all the surrounding circumstances, as an expression of the defendant's serious intent to injure or kill and, if so, what is the proper manner by which to make the "general intent" determination; does the First Amendment require proof of a defendant's "subjective intent," *i.e.*, proof that the defendant communicated a "true threat" *for the purpose of* threatening to injure or kill a person or persons;[7] or does the First Amendment require *both* proof that an objective "reasonable person" would understand a defendant's communication in context as a "true threat" to injure or kill, *as well as* proof of the defendant's subjective intent; that the defendant communicated a "true threat" for the purpose of threatening a specific person or group. **(4) Fact or Law**: As argued by the State, does the trial judge decide whether a defendant's conduct rose to the level of a "true threat" as a matter of law; or is that decision generally a question for the jury, or the trial court acting as trier of fact, to decide in the first instance. **(5) Proof of a "True**

---

[7] The Supreme Court has held that proof of a specific intent to *commit* the threatened action is not required: "The speaker need not actually intend to carry out the threat." *Black*, 538 U.S. at 359–60, 155 L. Ed. 2d at 552.

**Threat"**: What is sufficient in order for the State to meet its burden of proving a defendant's communication was a "true threat," including (a.) the definition of "true threat," (b.) the correct "intent" requirement, and (c.) consideration of the context within which the alleged "true threat" was made. **(6) Instructions**: Must the trial court, contrary to the State's position, instruct the jury in accordance with First Amendment "true threat" requirements.

1. Standard of Review

Generally, "'[u]pon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.'" *State v. Scott*, 356 N.C. 591, 595, 573 S.E.2d 866, 868 (2002) (citation omitted). However, "'[t]he standard of review for alleged violations of constitutional rights is *de novo*.' Under the *de novo* standard, this Court 'considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.'" *Shackelford*, __ N.C. App. at __, 825 S.E.2d at 695 (citations omitted). In addition, the Fourth Circuit has stated: "Whether a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law and fact that we review de novo." *Bly*, 510 F.3d at 457–58 (citing *Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 506–11, 80 L. Ed. 2d 502, 520–24 (1984)); *see also Matter of*

*N.D.A.*, __ N.C. __, __. 833 S.E.2d 768, 772–73 (2019) (citations omitted) ("As the Supreme Court of the United States has stated, an 'ultimate finding is a conclusion of law or at least a determination of a mixed question of law and fact' and should 'be distinguished from the findings of primary, evidentiary, or circumstantial facts.'").

Our review of issues related to jury instructions is also *de novo*:

> A trial court's jury instructions are sufficient if they present the law of the case in such a manner as to leave no reasonable cause for believing that the jury was misled or misinformed. A charge must be construed contextually, and isolated portions of it will not be held prejudicial when the charge as a whole is correct. When a defendant requests an instruction which is supported by the evidence and is a correct statement of the law, the trial court must give the instruction, at least in substance. Arguments challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court. A trial court's failure to submit a requested instruction to the jury is harmless unless defendant can show he was prejudiced thereby.

*Desmond v. News & Observer Publ'g Co.*, __ N.C. App. __, __, 823 S.E.2d 412, 434 (2018) (citation omitted), *disc. review allowed*, __ N.C. __, 824 S.E.2d 400 (2019). "[T]he Supreme Court of the United States [has] held that the trial court's unconstitutional failure to submit an essential element of the crime to the jury was subject to harmless error analysis." *State v. Bunch*, 363 N.C. 841, 844, 689 S.E.2d 866, 868–69 (2010) (citation omitted). However,

> Considering the importance of "safeguarding the jury guarantee," the Supreme Court of the United States requires "a reviewing court [to] conduct a thorough

examination of the record" before finding the omission harmless. "If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant [1] contested the omitted element and [2] raised evidence sufficient to support a contrary finding—it should not find the error harmless." Thus, the harmless error analysis . . . is twofold: (1) if the element is uncontested and supported by overwhelming evidence, then the error is harmless, but (2) if the element is contested and the party seeking retrial has raised sufficient evidence to support a contrary finding, the error is not harmless.

*Id.* at 845, 689 S.E.2d at 869 (citations omitted).

The Supreme Court has "determined that 'in cases raising First Amendment issues . . . an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression."'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 111 L. Ed. 2d 1, 17 (1990) (citing *Bose*, 466 U.S. at 499, 80 L. Ed. 2d at 515). "[T]he rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the fact[-]finding function be performed in the particular case by a jury or by a trial judge." *Bose*, 466 U.S. at 501, 80 L. Ed. 2d at 516–17. In *Watts*, the first "true threats" opinion, the Court conducted an independent review and reversed the jury's determination that the defendant had threatened the President, holding that, when viewed in context, the defendant's comments did not constitute a "true threat" as a matter of law. *Watts*,

394 U.S. at 706–08, 22 L. Ed. 2d at 666–69.  This obligation applies to all cases where

liability or guilt relies in part on whether the defendant's speech falls into one of the

recognized "unprotected" categories, such as "true threats":

> In such cases, the Court has regularly conducted an
> independent review of the record both to be sure that the
> speech in question actually falls within the unprotected
> category *and to confine the perimeters of any unprotected
> category within acceptably narrow limits in an effort to
> ensure that protected expression will not be inhibited*.

*Bose*, 466 U.S. at 505, 80 L. Ed. 2d at 519 (emphasis added); *see also id.* at 505–08,

80 L. Ed. 2d at 521–22; *Miller v. Fenton*, 474 U.S. 104, 114, 88 L. Ed. 2d 405, 413

(1985); *Hurley v. Irish-Am. Gay Grp.*, 515 U.S. 557, 567–68, 132 L. Ed. 2d 487, 499–

500 (1995).  It is the duty of the reviewing court to "independently decide whether the

evidence in the record is sufficient to cross the constitutional threshold[.]"  *Bose*, 466

U.S. at 511, 80 L. Ed. 2d at 523; *see also id.* at 503–10, 80 L. Ed. 2d 502 at 518–22.

Federal circuit courts have generally followed the *Bose* independent review standard:

> Following *Bose*, this court, like other [federal] courts of
> appeal, has extended the independent review rule well
> beyond defamation claims.  We have stated that "where the
> trial court is called upon to resolve a number of mixed
> fact/law matters which implicate core First Amendment
> concerns, our review, at least on these matters, is plenary."

*Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 106–07 (1st Cir. 2000) (citation omitted);

*Bly*, 510 F.3d at 457–58 (4th Cir. 2007) (citing *Bose*, 466 U.S. at 506–11, 80 L. Ed. 2d

at 520–24) ("Whether a written communication contains either constitutionally

protected 'political hyperbole' or an unprotected 'true threat' is a question of law and fact that we review de novo."); *Nor-West Cable Commc'ns v. City of St. Paul*, 924 F.2d 741, 746 (8th Cir. 1991) (citations omitted) ("*Bose* clearly holds that certain first amendment issues in addition to 'actual malice' must be reviewed *de novo* on appeal. *See Bose*, 466 U.S. at 504–08 (requiring independent review as to whether speech falls in [an] 'unprotected category' such as fighting words, incitement of lawless action, obscenity, and child pornography)."); *see also Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 688, 105 L. Ed. 2d 562, 589 (1989); *Edwards v. South Carolina*, 372 U.S. 229, 235, 9 L. Ed. 2d 697, 701–02 (1963).[8]

This Court has also adopted independent whole record review when reviewing a jury's determination that a defendant's speech fell into one of the "unprotected" categories: defamation. *Desmond*, __ N.C. App. at __, 823 S.E.2d at 422–23. This Court in *Desmond* cited extensively from *Harte-Hanks*:

> [T]he question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged. The meaning of terms such as "actual malice"—and, more particularly, "reckless disregard"—however, is not readily

---

[8] However, despite the seemingly clear language used by the Supreme Court in *Bose* and other opinions, not all federal circuit courts apply independent review to cases involving "true threats" or other categories of "unprotected" speech. *See Wheeler*, 776 F.3d at 742.

captured in one infallible definition. Rather, only through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech—the more elusive the standard, the less protection it affords. Most fundamentally, the rule is premised on the recognition that judges, as expositors of the Constitution, have a duty to independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Id.* (quoting *Harte-Hanks*, 491 U.S. at 685–89, 105 L. Ed. 2d at 587–89 (citations, quotation marks, and brackets omitted)). However, "credibility determinations are reviewed under the clearly-erroneous standard, because the trier of fact has had the 'opportunity to observe the demeanor of the witnesses[.]'" *Harte-Hanks*, 491 U.S. at 688, 105 L. Ed. 2d at 589 (citation omitted). Independent review is certainly no less of a necessity for protecting an individual's First Amendment rights in criminal cases than it is in civil cases, and it has been adopted by a number of state appellate courts for review of anti-threat convictions:

Whether language constitutes a true threat is an issue of fact for the trier of fact in the first instance. However, . . . a rule of independent appellate review applies in First Amendment speech cases. An appellate court "must 'make an independent examination of the whole record, . . .' so as to assure [itself] that the judgment does not constitute a forbidden intrusion on the field of free expression." . . . Thus, whether a statement constitutes a true threat is

a matter subject to independent review.

*Washington v. Johnston*, 127 P.3d 707, 712–13 (Wash. 2006) (alteration in original) (citations omitted); *see also, e.g., Connecticut v. Krijger*, 97 A.3d 946, 955 (Conn. 2014).

In light of the weight of precedent in the federal courts, other state courts, and this Court's opinion in *Desmond*, we hold that this Court should apply independent whole record review, as set forth in *Bose*, *Harte-Hanks*, and *Desmond*, whenever a defendant's conviction is based in part on a determination that the State met its burden of proving the existence of a "true threat."

## 2. Elements

"Much turns on the determination that a fact is an element of an offense, . . . given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones v. United States*, 526 U.S. 227, 232, 143 L. Ed. 2d 311, 319 (1999) (citations omitted); *see also State v. Guice*, 141 N.C. App. 177, 189, 541 S.E.2d 474, 482 (2000), *modified on reh'g*, 151 N.C. App. 293, 564 S.E.2d 925 (2002). It appears that certain issues are occurring at the trial court level in part because the relevant First Amendment requirements are not treated as *essential elements* of the underlying anti-threat statutes. In this case, the State repeatedly argued that it did not have to prove a "true threat" in order to convict Defendant under N.C.G.S. § 14-16.7(a), and that the trial court should not instruct the jury in accordance with "true threat" jurisprudence. The State argued that

N.C.G.S. § 14-16.7(a) contained only three elements: "The pattern jury instructions are clear that there are three and only three elements to this charge. Now with regards to the threat, the only element is that the defendant knowingly and willfully made a threat to kill the victim." The State further argued: "I get that [D]efendant is raising First Amendment objections to that statute as it's written, but I think the proper venue to take that up would be if upon conviction to take that up on appeal." "[I]t is the legislature's intent . . . that there be no requirement of proof to show that the threat was made in a manner and under circumstances which would cause a reasonable person to believe it is likely to be carried out." "[M]aking any threats towards . . . court officials . . . is unacceptable to the legislature, *regardless of whether they were made in a manner that a reasonable person would believe they would be carried out*." (Emphasis added). The trial court appeared to agree with the State.

It is well established that a defendant cannot receive a fair, *i.e.*, constitutional, trial, unless *all* essential elements of the crime charged are "submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 570 U.S. 99, 116, 186 L. Ed. 2d 314, 329 (2013); *Apprendi v. New Jersey*, 530 U.S. 466, 476–77, 147 L. Ed. 2d 435, 447 (2000); *State v. Rankin*, __ N.C. __, __, 821 S.E.2d 787, 790 (2018). "The substance and scope of this right depend upon the proper designation of the facts that are elements of the crime." *Alleyne*, 570 U.S. at 104–05, 186 L. Ed. 2d at 322. As noted by the Court in *Alleyne*: "If a fact [is] by law *essential to the penalty*, it [is]

an element of the offense." *Id.* at 109, 186 L. Ed. 2d at 325 (emphasis added) (citation

omitted). This definition of an "element" was recently reaffirmed by our Supreme

Court:

> [There is] well-established binding precedent from this
> Court holding that the complete and definite description of
> a crime is one in which each essential element necessary to
> constitute that crime is included. [*State v. Johnson*, 229
> N.C. 701, 706, 51 S.E.2d 186, 190 (1949)] (observing that
> *the State carries the burden of establishing the "essentials
> of the legal definition of the offense itself"*).

*Rankin*, __ N.C. at __, 821 S.E.2d at 793 (emphasis added) (citations omitted). On

appeal, the State recognizes that Defendant's comments were protected by the First

Amendment unless they were "true threats." We agree, and because proof of a "true

threat" is essential to prosecution pursuant to N.C.G.S. § 14-16.7(a), "true threat"

must be included in the definition of the crime of threatening to kill a court officer.

Further, "true threat" must be included as an "essential element" of the statute. *Id.*;

*Alleyne*, 570 U.S. at 109, 186 L. Ed. 2d at 325.

We hold that "true threat" must be included as an essential element of the

statute based upon the following: N.C.G.S. § 14-16.7(a) criminalizes, in part, the

communication of "threats" to kill certain classifications of people. *Id.* The First

Amendment requires that an anti-threat statute such as N.C.G.S. § 14-16.7(a) be

construed so that the word "threat" is read as "true threat," and that the State prove

a "true threat," to the jury or trier of fact, beyond a reasonable doubt. *See Watts*, 394

U.S. at 708, 22 L. Ed. 2d at 667; *United States v. Patillo*, 431 F.2d 293, 295 (4th Cir. 1970), *adhered to*, 438 F.2d 13 (4th Cir. 1971). Therefore, "true threat" must be incorporated into the *definition* of N.C.G.S. § 14-16.7(a) if the statute is to be held constitutional. *See Alleyne*, 570 U.S. at 109, 186 L. Ed. 2d at 325; *Rankin*, __ N.C. at __, 821 S.E.2d at 793–94 (emphasizing that the definition of a crime includes descriptions of what constitutes the crime as well as what does not constitute the crime and that, "if . . . words, though in the form of a proviso or an exception, are in fact, and by correct interpretation, but a part of the definition and description of the offense, they" constitute an essential element of the crime).

Although the Supreme Court has not *expressly* stated that "true threat" is an element of anti-threat statutes, it ha**s** consistently treated "true threat," and the requisite intent, as essential elements of any *constitutional* anti-threat statute. The Court has required the jury to be instructed on First Amendment elements, implicitly in the case of "true threat," but expressly for other categories of "unprotected" speech. *See Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667 ("[W]hatever the 'willfullness' requirement implies, the statute initially requires the Government to prove a true 'threat.'"); *see also Elonis v. United States*, 575 U.S. 723, __, 192 L. Ed. 2d 1, 23–4 (2015) (Thomas, J., dissenting) (citations omitted) ("Because § 875(c) criminalizes speech, the First Amendment requires that the term 'threat' be limited to a narrow class of historically unprotected communications called 'true threats.' . . . There is

thus no dispute that, at a minimum, § 875(c) requires an objective showing: The communication must be one that 'a reasonable observer would construe as a true threat to another.'"); *Black*, 538 U.S. at 365, 155 L. Ed. 2d at 556 ("As interpreted by the jury instruction, [which did not require the jury to find a true threat,] the [statute] chills constitutionally protected political speech because of the possibility that [the government] will prosecute—and potentially convict—somebody engaging only in lawful political speech at the core of what the First Amendment is designed to protect.").

This is in accord with the Supreme Court's treatment of First Amendment requirements for the other categories of "unprotected speech." *See, e.g., Miller v. California*, 413 U.S. 15, 21, 37 L. Ed. 2d 419, 428–29 (1973) (discussing the required elements to prove "obscenity" that falls outside of First Amendment protections); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 706 (1964) (imposing "actual malice" as an element in defamation actions brought by public officials: "The constitutional guarantees require . . . a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'"); *Yates v. United States*, 354 U.S. 298, 324–25, 1 L. Ed. 2d 1356, 1378–79 (1957) (holding the defendant's conviction violated his First Amendment rights because "[t]he jury was never told that the Smith Act does not denounce advocacy in the sense

of preaching abstractly the forcible overthrow of the Government[,]" and "the urging of action for forcible overthrow [was] a necessary *element* of the proscribed advocacy"), *overruled on other grounds by Burks v. United States*, 437 U.S. 1, 57 L. Ed. 2d 1 (1978); *Bose*, 466 U.S. at 506–07, 80 L. Ed. 2d at 520–21 (citation omitted) (stating, in a prosecution for obscenity, "questions of what appeals to 'prurient interest' and what is 'patently offensive' under the [First Amendment] community standard obscenity test are 'essentially questions of fact'" that must be proven to the jury); *Ginsberg v. New York*, 390 U.S. 629, 643, 20 L. Ed. 2d 195, 206 (1968).

In addition, the Supreme Court has held that placing the burden on a defendant to prove his speech was protected, rather than placing the burden on the government to prove the defendant's speech was "unprotected," is unconstitutional:

> [W]here particular speech falls close to the line separating the lawful and the unlawful, the possibility of mistaken factfinding—inherent in all litigation—will create the danger that the legitimate utterance will be penalized. The man who knows that he must bring forth proof and persuade another of the lawfulness of his conduct necessarily must steer far wider of the unlawful zone than if the State must bear these burdens.

*Speiser v. Randall*, 357 U.S. 513, 526, 2 L. Ed. 2d 1460, 1473 (1958); *id.* (citation omitted) ("Where the transcendent value of speech is involved, due process certainly requires . . . that the State bear the burden . . . to show that the appellants engaged in criminal speech."); *see also United States v. Turner*, 720 F.3d 411, 419 (2d Cir. 2013) ("the evidence at trial was more than sufficient to permit a reasonable jury to find

each of the elements of [the anti-threat statute]—including the requirement of a true threat—beyond a reasonable doubt"); *United States v. Pinson*, 542 F.3d 822, 832 (10th Cir. 2008) ("The burden is on the prosecution to show that the defendant understood and meant his words as a [true] threat, and not as a joke, warning, or hyperbolic political argument."); *United States v. Gilbert*, 813 F.2d 1523, 1530 (9th Cir. 1987) ("The government bears the ultimate burden of proving that [the defendant's] actions were taken with the requisite intent to place them into [the] category [of a 'true threat']."); *United States v. Hoffman*, 806 F.2d 703, 708 (7th Cir. 1986).

Our holding is in line with most jurisdictions; in fact, we are unaware of any jurisdiction that has not treated "true threat" as an essential element of an anti-threat statute. Like every other federal jurisdiction, the Fourth Circuit recognized that in *Black*, the Supreme Court, in defining "true threat," "was defining the necessary *elements* of a threat crime in the context of a criminal statute punishing intimidation." *White I*, 670 F.3d at 509. "In deciding *Watts*, the Court recognized *two major elements* in the offense created by Congress in 18 U.S.C. Section 871(a). The first is that there be proved 'a true "threat,"' and the second is that the threat be made 'knowingly and willfully[.]'" *Patillo*, 431 F.2d at 295 (emphasis added) (citations omitted); *see also, e.g., United States v. Houston*, 792 F.3d 663, 668–69 (6th Cir. 2015); *United States v. Lockhart*, 382 F.3d 447, 449–50 (4th Cir. 2004); *United States v. Francis*, 164 F.3d 120, 123 (2d Cir. 1999).

Further, both Supreme Court and federal circuit court precedent recognizes an *intent* requirement must also be read into an anti-threat statute. *See New York v. Ferber*, 458 U.S. 747, 765, 73 L. Ed. 2d 1113, 1127 (1982) (citations omitted) ("As with obscenity laws, criminal responsibility [for child pornography] may not be imposed without some element of scienter on the part of the defendant."); *Morissette v. United States*, 342 U.S. 246, 263, 96 L. Ed. 288, 300 (1952) (emphasis added) (holding that "mere omission from [the statute] of any mention of intent will not be construed as eliminating that *element* from the crimes denounced"); *Houston*, 792 F.3d at 667; *Bagdasarian*, 652 F.3d at 1118 (emphasis added) (citation omitted) ("*Black* 'affirmed our own dictum—not always adhered to in our cases—that "the *element of intent* [is] the determinative factor separating protected expression from unprotected criminal behavior."'"); *United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) (emphasis added) ("Having held that *intent to threaten is a constitutionally necessary element of a statute punishing threats*, we do not hesitate to construe 18 U.S.C. § 1860 to require such intent."); *Francis*, 164 F.3d at 121 ("Although the statute does not mention intent or willfulness, intent is of course an element of the crime.").[9]

---

[9] The "knowingly and willfully" language in N.C.G.S. § 14-16.7(a) imposes an element of intent, but in this case the State and the trial court interpreted "knowingly and willfully" as meaning Defendant understood the words he wrote and intentionally communicated them by posting them on Facebook; and that Defendant knew D.A. Welch was a court officer. Defendant did not object on the basis that the statute itself should be read as requiring that Defendant intended his Facebook posts to threaten anyone.

When a criminal statute is written without expressly including, as elements, the requirements of the First Amendment, the statute *must be construed and applied* at trial with the First Amendment requirements included as essential elements of the statutory crime. This principle is well established in North Carolina. *See Summrell*, 282 N.C. at 167, 192 S.E.2d at 575 (citation omitted) ("a statute which defines proscribed activity so broadly that it encompasses constitutionally protected speech[] cannot be upheld in the absence of authoritative judicial limitations"). "[I]t is well settled . . . that a statute will not be construed so as to raise a question of its constitutionality 'if a different construction, which will avoid the question of constitutionality, is reasonable.'" *Id.* at 168, 192 S.E.2d at 576 (citation omitted). The trial court may often construe a statute otherwise unconstitutional on its face by instructing the jury on the complete definition of the crime, that is, a definition that includes the statutory elements *as well as* constitutionally required elements. In *Summrell*, the trial court cured the First Amendment issues inherent in the underlying statutes, because it "construed [the statutes] to prohibit only ['fighting words'] and conduct likely to provoke ordinary men to violence. [The trial court] deleted the [unconstitutional language] and left undisturbed the statutes' proscription against acts and language calculated to bring on a breach of the peace." *Id.* at 167–68, 192 S.E.2d at 575–76; *see also State v. Clark*, 22 N.C. App. 81, 87, 206 S.E.2d 252, 256 (1974) (emphasis added) ("Defendant also argues that section (a)(2)

of G.S. § 14-288.4, as amended in 1971, is unconstitutionally vague and overbroad. This argument has no application to the present case because *the trial judge restricted the jury's consideration of what constituted disorderly conduct* to sections (a)(3), (a)(4), and (a)(5)b. of G.S. § 14-288.4 (1971). Defendant advances no argument that these sections are unconstitutional."); *State v. Orange*, 22 N.C. App. 220, 222–23, 206 S.E.2d 377, 379 (1974).

In order to constitutionally determine a communication falls into the "true threat" "unprotected" category of speech, the requirements imposed by the First Amendment must be included as *essential elements* of the underlying crime charged. Further, the "intent" required to prove "true threat" in accordance with the First Amendment is also an *element* of the underlying crime, and must be proven by the State, to the jury, beyond a reasonable doubt. We therefore hold that "true threat," and the proper intent requirements, are essential elements of N.C.G.S. § 14-16.7(a) and must be treated as such by the trial court. We discuss the appropriate intent requirements next.

### 3. Intent

Congress enacted the anti-threat statute that would become 18 U.S.C. § 871(a) on 14 February 1917. *See Ragansky v. United States*, 253 F. 643, 644 (7th Cir. 1918). 18 U.S.C. § 871(a) states in part:

> Whoever knowingly and willfully deposits for conveyance
> in the mail . . . any . . . writing . . . containing any threat to

take the life of . . . or to inflict bodily harm upon the President of the United States, . . . or knowingly and willfully otherwise makes any such threat against the President, . . . shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 871(a). Shortly thereafter, federal courts began interpreting this statute and the intent requirement for 18 U.S.C. § 871(a) and other anti-threat statutes. The intent requirement for anti-threat statutes was primarily taken from the Seventh Circuit's 1918 opinion in *Ragansky*. The "*Ragansky* test of intention" was adopted by the majority of federal jurisdictions to determine the element of "willfulness" in prosecutions under 18 U.S.C. § 871(a). *United States v. Patillo*, 438 F.2d 13, 14 (4th Cir. 1971) (*Patillo II*). The Supreme Court did not address any of the issues raised by 18 U.S.C. § 871(a) and other anti-threat statutes until *Watts*, where the Court, referencing *Ragansky* specifically, acknowledged that there was disagreement in the lower courts "over whether or not the 'willfullness' requirement of [18 U.S.C. § 871(a)] implied that a defendant must have intended to carry out his 'threat.'" *Watts*, 394 U.S. at 707, 22 L. Ed. 2d at 667. The defendant in *Ragansky* was convicted of "knowingly and willfully making threats to take the life of the President" pursuant to 18 U.S.C. § 871. *Ragansky*, 253 F. at 644. The defendant had made the statements:

"I can make bombs and I will make bombs and blow up the President"; . . . "We ought to make the biggest bomb in the world and take it down to the White House and put it on the dome and blow up President Wilson and all the rest of the crooks, and get President Wilson and all of the rest of the crooks and blow it up" [and;] "I would like to make a

> bomb big enough to blow up the Capitol and President and
> all the Senators and everybody in it."

*Id.* at 644. The *Ragansky* court stated: "[I]t appears . . . that 'there was a claim by this defendant and testimony in corroboration of his claim that he was joking, that he was not in earnest, that he did not intend to kill him.'" *Id.* The trial court instructed the jury that the defendant's "'claim that the language was used as a joke, in fun,' is not a defense." *Id.* On appeal, the Seventh Circuit defined "willfully" and "knowingly," and articulated a standard for intent in anti-threat statutes:

> It was not claimed that every one present understood that he was joking, *or that he intended them so to understand*;[10] the claim appears to have been that defendant had no intention to carry out his threat, and that, therefore, it was a joke; the instruction read in the light of the entire charge must be so construed, and in our judgment it was correct.
>
> A threat is knowingly made, if the maker of it comprehends the meaning of the words uttered by him; a foreigner, ignorant of the English language, repeating these same words without knowledge of their meaning, may not knowingly have made a threat.
>
> And a threat is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and *intentionally* utters them *as the declaration of an apparent determination to carry them into execution*.
>
> Defendant, while conceding that an intention actually to

---

[10] Even in *Ragansky* the court is considering the defendant's intent, *i.e.*, what *effect* the defendant *intended his statements to have* on his audience. The implication from the inclusion of what the defendant *did not claim* at trial is that, had there been evidence he intended his statements to be understood as a joke, the outcome may have been different.

carry out the threat or the President's knowledge of the threat is not essential, contends that the language must be used with an evil or malicious intent to express a sentiment to be impressed upon the minds of persons through which it might create a sentiment of hostility to the security of the President, "that willfully implies an evil purpose—legal malice."

[The defendant's] present contention cannot be sustained, if by evil purpose or legal malice, more is meant than *an intention to give utterance to words* which, *to defendant's knowledge*, were in form and *would naturally be understood by the hearers as being a threat; that is, the expression of a determination, whether actual or only pretended, to menace the President's safety*.

While under some circumstances, the word "willfully" in penal statutes means not merely voluntarily, but with a bad purpose, nothing in the text, context, or history of this legislation indicates the materiality of the hidden intent or purpose of one who, in the presence of others, voluntarily uses language *known by him to be in form such a threat*, and who thus, to some extent endangers the President's life.

*Id.* at 644–45 (citations omitted) (emphasis added). *Ragansky* appears to have required not only that a defendant knew the meaning of the words conveyed, and that the defendant willfully conveyed them, but that the words conveyed were "known by him" to be "in form [that] would naturally be understood by the hearers as being a threat; that is, the expression of a determination, whether actual or only pretended, to menace the President's safety." *Id.* at 645.

Despite this apparent requirement in *Ragansky* that a defendant subjectively *know* the alleged threat would "naturally be understood" as a threat, *id.*, the

"*Ragansky* test" was interpreted in subsequent opinions by the majority of federal

districts to contain no subjective intent requirement, and thus became a pure "general

intent" test. *See United States v. Darby*, 37 F.3d 1059, 1066 (4th Cir. 1994) (citation

omitted) ("'[s]ection 18 U.S.C. § 875(c) does not require specific intent in regard to the

threat element of the offense, but only general intent'"). The general intent test

requires "only that the defendant knowingly transmitted the . . . communication[,]"

*id.* at 1064 (citations omitted), and that "'there is substantial evidence that tends to

show beyond a reasonable doubt that an ordinary, reasonable recipient who is

familiar with the context of the [communication] would interpret it as a threat of

injury[.]'" *Id.* at 1065 (citation omitted).[11] This is a negligence standard:

> Courts then ask . . . whether a reasonable person equipped
> with that knowledge, not the actual defendant, would have
> recognized the harmfulness of his conduct. That is
> precisely the Government's position here: [The defendant]
> can be convicted . . . if he himself knew the contents and
> context of his posts, and a reasonable person would have
> recognized that the posts would be read as genuine threats.
> That is a negligence standard.

*Elonis*, 575 U.S. at __, 192 L. Ed. 2d at 15–6. The "general intent" negligence

standards applied in federal and state jurisdictions do not include the apparent

---

[11] The Fourth Circuit employs a "reasonable recipient" of the alleged threat "general intent" standard, which is in line with *Ragansky*, but this version of the general intent standard is not universally accepted in the federal circuits. Furthermore, the Fourth Circuit occasionally applies the specific intent standard set forth in *Patillo*, 431 F.2d 293 and *Patillo II*, 438 F.2d 13. *See Lockhart*, 382 F.3d at 449–50.

requirement in *Ragansky* that the defendant must have had "an intention" to communicate "words which, *to defendant's knowledge,* were in form and would naturally be understood by the hearers as being a threat[.]" *Ragansky*, 253 F. at 645 (emphasis added).[12]

Our reading of *Ragansky* is bolstered by the *Ragansky* court's reliance on *United States v. Stickrath*, 242 F. 151 (S.D. Ohio 1917). The court in *Stickrath* stated: "Doing a thing knowingly and willfully implies, not only a knowledge of the thing, but a determination with a bad intent to do it. *Felton v. U.S.*, 96 U.S. 699; *Potter v. U.S.*, 155 U.S. 438, 446." *Stickrath*, 242 F. at 154 (citations omitted). The court further explained:

> As used in the statute [the terms "knowingly" and "willfully"] are intended to signify that the defendant, at the time of making the threat charged against him, *must have known what he was doing*, and, *with such knowledge*, proceeded in violation of law to make [the threat]. They are *used in contradistinction to "ignorantly" and "unintentionally."* The offense denounced by the statute is completed at the instant the unlawful threat is knowingly and willfully made. It is not the execution of such threat, *or* (as claimed by defendant) *a continuing intent to execute it*, that constitutes the offense, *but the making of it knowingly and willfully*. If it be thus made, *the subsequent abandonment of the bad intent with which it was made does not obliterate the crime.*

---

[12] Also: "[O]ne who, in the presence of others, voluntarily uses language known by him to be in form . . . a threat[,]" *i.e.*, "the expression of a determination, whether actual or only pretended, to menace the President's safety[,]" may be prosecuted under the statute. *Ragansky*, 253 F. at 645 (citation omitted) (emphasis added).

STATE V. TAYLOR

*Opinion of the Court*

*Id.* (emphasis added). Pursuant to the holding in *Stickrath*, a defendant had to "know what he was doing," *i.e.*, making a threat, and "with such knowledge, proceed in violation of law to make it." *Id.* Thus, the holding in *Stickrath* appears to require that the defendant had "the bad intent" to carry out the threat at the time the threat was made, but once the defendant had made the threat with intent to carry it out, the crime was complete, and the defendant's subsequent abandonment of the bad intent to carry out the threat was no defense. *Id.* Therefore, though *Ragansky* cited *Stickrath* in support of its holding, *Ragansky* actually contradicts *Stickrath's* statement that "[d]oing a thing knowingly and willfully implies, not only a knowledge of the thing, but a determination with a bad intent to do it." *Id.* The logical implication from *Stickrath* is that an intent to execute the alleged threat had to exist at the time it was made. *Id.* *Ragansky* abandoned the *Stickrath* specific intent to carry out the threat element, but maintained a specific intent element requiring proof that a defendant had "an intention to give utterance to words which, to defendant's knowledge, were in form and would naturally be understood by the hearers as being a threat[.]" *Ragansky*, 253 F. at 645.

It was these intent elements that were mentioned in *Watts*. In the case of *Watts*, the defendant was convicted under 18 U.S.C. § 871 of knowingly and willfully making a threat to kill the President. *Watts v. United States*, 402 F.2d 676, 677 (D.C. Cir. 1968) ("*Watts I*"), *rev'd*, 394 U.S. 705, 22 L. Ed. 2d 664 (1969). The defendant's

appeal was rejected by the D.C. Circuit Court of Appeals, which affirmed the following jury instruction: "'It is the making of the threat, not the intent to carry it out, that violates the law.'" *Id.* at 678. Judge Wright dissented in *Watts I*, thoroughly reviewing the legislative history of the statute and its subsequent treatment by federal courts. *Id.* at 686–91 (Wright, J., dissenting). Judge Wright stated: "Where statutes impinge upon protected speech, statutory provisions governing intent will be read to require specific intent." *Id.* at 691 (citations omitted).

In *Watts*, the Supreme Court reversed the circuit court's *Watts I* opinion and specifically cited Judge Wright's dissent as it seriously questioned the constitutionality of the *Ragansky* test:

> Some early cases [such as *Ragansky*] found the willfullness requirement met if the speaker voluntarily uttered the charged words with "an apparent determination to carry them into execution." The majority below seemed to agree. Perhaps this interpretation is correct, *although we have grave doubts about it. See the dissenting opinion below*, [*Watts I*], 402 F.2d at 686–93 (Wright, J.).

*Watts*, 394 U.S. at 707–08, 22 L. Ed. 2d at 667 (emphasis added) (some citations omitted).

Despite the Court's apparent agreement, at least in part, with Judge Wright's dissent, and its stated "grave doubts" that the *Ragansky* standard could survive First Amendment analysis, the Court did not answer the question of whether the First Amendment requires a specific, as well as general, intent standard. The Court did,

however, make clear that the First Amendment does not permit prosecution of every communication that could be considered threatening: "[A] statute such as this one, which makes criminal a form of pure speech, must be interpreted with the commands of the First Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech." *Watts*, 394 U.S. at 707, 22 L. Ed. 2d at 667. The Court held: "[W]hatever the 'willfullness' requirement implies, the statute initially requires the Government to prove a true 'threat.' We do not believe that the kind of political hyperbole indulged in by [the defendant] fits within that statutory term." *Id.* at 708, 22 L. Ed. 2d at 667. This holding is the genesis of the "true threat" requirement.

The result of the Court's decision not to decide the intent issue was that most federal circuits maintained the *status quo*. Although most circuits continued to apply a general intent standard after *Watts*, in *United States v. Patillo* the Fourth Circuit responded to *Watts* by essentially adopting the standard set forth in Judge Wright's dissent in *Watts I*: "In deciding *Watts*, the [Supreme] Court recognized two major elements in the offense created by Congress in 18 U.S.C. Section 871(a). The first is that there be proved a true 'threat,' and the second is that the threat be made 'knowingly and willfully[.]'" *Patillo*, 431 F.2d at 295. In *Patillo*, the Fourth Circuit held the defendant's statements were "true threats," then stated: "We must next determine whether the trier of fact properly found that those threats were uttered

with the degree of willfulness sufficient for conviction under" the anti-threat statute. *Id.* at 296. The *Patillo* court further stated: "*Watts* [] does not resolve a long term controversy over whether 'willfulness' means 'that a defendant must have intended to carry out his 'threat[,]'" but noted the Supreme Court had "grave doubts" that the statute could be constitutionally applied without a specific intent requirement. *Id.* (citation omitted). The court in *Patillo* determined the First Amendment required a defendant's intent to be something more than that set forth in the *Ragansky* standard:

> We think that many of the courts that construed Section 871(a) prior to *Watts* departed "from the plain meaning of words . . . in search of an intention which the words themselves did not suggest," with pernicious results. . . . The interpretation of "knowingly and willfully" alluded to by the Supreme Court in *Watts* was first stated in [*Ragansky*:]
>
> > A threat is knowingly made, if the maker of it comprehends the meaning of the words uttered by him. . . . And a threat is willfully made, if in addition to comprehending the meaning of his words, the maker voluntarily and intentionally utters them as the declaration of an apparent determination to carry them into execution.
>
> This language in *Ragansky* was part and parcel of a holding, now discredited by *Watts*, that a statement made in jest falls within the ambit of Section 871(a).
>
> The *Ragansky* interpretation of "willfully and knowingly" is not in keeping with the meaning traditionally accorded to those words when found in criminal statutes. "The word [willfully] often denotes an act which is intentional, or

knowing, or voluntary, as distinguished from accidental. But when used in a criminal statute it generally means an act done with a bad purpose. . . ." *Ragansky's* version of the willfulness requirement demands only an "apparent determination," expressed by the words themselves, to perpetrate the act threatened. We believe that a "bad purpose" assumes even more than its usual importance in a criminal prosecution based upon the bare utterance of words. Americans, nurtured upon the concept of free speech, are not accustomed to controlling their tongues to avoid criminal indictment.

*Id.* at 297 (citations omitted). The court concluded: "We hold that where, as in [this] case, a true threat against the person of the President is uttered without communication to the President intended, the threat can form a basis for conviction under the terms of Section 871(a) only if made with a *present intention to do injury* to the President." *Id.* at 297–98 (emphasis added) (footnote omitted). The Fourth Circuit reconsidered *Patillo en banc* because: "It [was] urged upon us in the [government's] petition that the Supreme Court's 'grave doubts,' [stated in *Watts*,] as to the *Ragansky* test of intention must now have been dispelled by two recent decisions from the Second and Ninth Circuits." *Patillo II*, 438 F.2d at 14 (citations omitted). *Patillo II* reviewed the "two recent decisions," but reasoned:

[F]or the reasons stated in the majority opinion of the [*Patillo*] panel, we reject the *Ragansky* test of intention. We think that an *essential element* of guilt is a present intention either to injure the President, or incite others to injure him[.] Much of what we say here is *dicta* justified, we think, by apparent misunderstanding of our prior panel decision.

- 57 -

*Id.* at 16 (citation omitted). Although the Fourth Circuit now appears to apply a general intent standard when reviewing anti-threat statutes, s*ee Darby*, 37 F.3d at 1066, *Patillo* and *Patillo II* have been cited by the Fourth Circuit as recently as 2004 and have not been expressly overruled. *See Lockhart*, 382 F.3d at 449–50; *United States v. Cooper*, 865 F.2d 83, 85 (4th Cir. 1989) (specific intent requirement of *Patillo* was met in prosecution under 18 U.S.C. § 878 because evidence sufficient for jury to determine the defendant "had a present intention to shoot Gandhi").

The Supreme Court's next case involving "true threats" was *Rogers v. United States*, 422 U.S. 35, 45 L. Ed. 2d 1 (1975). However, the Court again resolved the case without addressing the issue of intent. *Id.* at 40–41, 45 L. Ed. 2d at 7. Justice Marshall wrote a concurring opinion in *Rogers*, which Justice Douglas joined, stating in part:

> The District Court and the Court of Appeals adopted what has been termed the "objective" construction of the [anti-threat] statute. This interpretation of [section] 871 originated with the early case of *Ragansky*, and it has been adopted by a majority of the Courts of Appeals, even though this Court has expressed "grave doubts" as to its correctness. As applied in *Ragansky* and later cases, this construction would support the conviction of anyone making a statement that would reasonably be understood as a threat, as long as the defendant intended to make the statement and knew the meaning of the words used.

*Id.* at 43, 45 L. Ed. 2d at 8 (Marshall, J., concurring) (footnotes and citations omitted).[13] Justice Marshall stated: "In my view, this construction of [section] 871 is too broad." *Id.* at 44, 45 L. Ed. 2d at 9. "In *Watts*, [the Court] observed that giving [section] 871 an expansive construction would create a substantial risk that crude, but constitutionally protected, speech might be criminalized." *Id.* Justice Marshall further stated: "Both the legislative history and the purposes of the statute are inconsistent with the 'objective' construction of [section] 871 and suggest that a narrower view of the statute is proper." *Id.* Justice Marshall concluded: "I would therefore interpret [section] 871 to require proof that the speaker intended his statement to be taken as a threat, even if he had no intention of actually carrying it out." *Id.* at 48, 45 L. Ed. 2d at 11.

Individual justices have continued to express their beliefs that the First Amendment requires a specific intent as well as a general intent. *See, in chronological order, Abrams v. United States*, 250 U.S. 616, 627, 63 L. Ed. 1173, 1179 (1919) (Holmes, J., dissenting) ("[W]hen words are used exactly, a deed is not done with intent to produce a consequence unless that consequence is the aim of the deed. It may be obvious, and obvious to the actor, that the consequence will follow, and he may be liable for it even if he regrets it, but he does not do the act with intent to produce it unless the aim to produce it is the proximate motive of the specific act,

---

[13] As discussed above, it is not clear that the interpretation of *Ragansky* in subsequent opinions correctly states the standard set forth therein.

although there may be some deeper motive behind."); *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667 (stating the Court "ha[d] grave doubts" that the general intent standard was constitutionally sufficient to sustain a conviction pursuant to an anti-threat statute); *Elonis*, 575 U.S. at __, 192 L. Ed. 2d at 20–2 (Alito, J., concurring) (arguing that the First Amendment required something more than an objective standard, but that a "recklessness" standard would suffice); *Perez v. Florida*, __ U.S. __, __, 197 L. Ed. 2d 480, 482 (2017) (Sotomayor, J., concurring) ("Together, *Watts* and *Black* make clear that to sustain a threat conviction without encroaching upon the First Amendment, States must prove more than the mere utterance of threatening words— some level of intent is required. And these two cases strongly suggest that it is not enough that a reasonable person might have understood the words as a threat—a jury must find that the speaker actually intended to convey a threat.").

The next Supreme Court opinion involving "true threats" was *Black*, which contained the first definition of a "true threat" by the Court, and seriously called into question the constitutionality of prosecuting someone under an anti-threat statute without any "true threat" specific intent requirement. *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552 (citation omitted) (stating in part that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals"). Thereafter, the Fourth Circuit

recognize[d] the potential for a conflict between the Supreme Court's definition of a true threat [in *Black*] and an objective analysis of a true threat. At least two Circuit Courts of Appeal have seized upon this potential conflict, and resolved it by concluding that the Supreme Court's definition of a true threat . . . precludes an objective analysis. Other courts have suggested that *Black* be interpreted to require both an objective and subjective inquiry in the analysis of a true threat.

*United States v. White*, 2010 WL 438088, at *8 (W.D.Va. Feb. 4, 2010), *aff'd in part, vacated in part, and remanded*, 670 F.3d 498 (4th Cir. 2012) (citations omitted). The Fourth Circuit decided to "remain" a general intent jurisdiction despite *Black*.[14] *White I*, 670 F.3d at 509 (citation omitted) (emphasis in original) ("[W]hile the speaker need only *intend to communicate* a statement, whether the statement amounts to a true threat is determined by the understanding of a *reasonable recipient familiar with the context* that the statement is a 'serious expression of an intent to do harm' to the

---

[14] Except for the uncertain status of *Patillo*, 431 F.2d 293. *See Lockhart*, 382 F.3d at 449–50; *United States v. Spring*, 305 F.3d 276, 280–81 (4th Cir. 2002); *United States v. Maxton*, 940 F.2d 103, 106 (4th Cir. 1991) (citation omitted) ("extrinsic evidence to prove an intent to threaten should only be necessary when the threatening nature of the communication is ambiguous"); *Cooper*, 865 F.2d at 85 (specific intent requirement of *Patillo* met because evidence was sufficient for jury to conclude the defendant "had a present intention to shoot Gandhi"); *United States v. McMurtrey*, 826 F.2d 1061, 1987 WL 38495, *2 (4th Cir. 1987) (unpublished) (citing *Patillo*, and holding "a present intent to do injury" is essential element of 18 U.S.C. § 871(a)); *United States v. Maisonet*, 484 F.2d 1356, 1359 (4th Cir. 1973) (finding First Amendment requirements satisfied because the jury was "charged . . . that the government was required to prove . . . that [the defendant] intended [the communication] to be such a threat"); *United States v. Smith*, 448 F.2d 726, 727 (4th Cir. 1971); *United States v. Dutsch*, 357 F.2d 331, 333 (4th Cir. 1966) (citation omitted) ("[A] conviction under 18 U.S.C. § 875(c) requires a showing that a threat was intended[.]"); *but see Darby*, 37 F.3d at 1063–66 (4th Cir.) (holding no specific intent required, partly on the erroneous determination that the relevant language in *Dutsch* was "merely *dictum*," and by dismissing *Patillo* in a footnote without any analysis).

recipient. This is and has been the law of this circuit, and nothing in *Black* appears to be in tension with it.").

General intent jurisdictions like the Fourth Circuit have focused on the following language from *Black*: "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552. These jurisdictions have construed this language as consistent with the general intent standard that evolved from *Ragansky*, *i.e.*, that the defendant understood the meaning of the words in the statement alleged to be a threat; a reasonable person familiar with the context would understand the statement as "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals[,]" *id.*; and the defendant "mean[t] to communicate" the statement. The State need only prove that the defendant intended to communicate the statement, without regard to whether the defendant meant the statement to constitute or contain a threat of any kind, and without regard to whether the defendant had any bad purpose in communicating the statement.

However, this interpretation does not appear to us as being the only logical reading of *Black*, nor even the most obvious. Particularly since we are construing language involving criminal liability, *see Rogers*, 422 U.S. at 47, 45 L. Ed. 2d at 10–1, the interpretation of the *Black* "true threat" definition found in *White I*, 670 F.3d

at 509, and opinions from other jurisdictions, leaves us unconvinced. The definition in *Black* can just as readily be read as holding a "true threat" is one where what "the speaker means to communicate" is a "statement" the speaker *intends* the recipient to understand as "a serious expression of an intent to commit an act of unlawful violence[.]" *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552; *see also, generally, United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68–9, 79, 130 L. Ed. 2d 372, 379, 385 (1994) (holding First Amendment required construction of a statute so that the intent element attaches to all of the additional elements). For example: "John's statement was meant to communicate a serious expression of an intent to kill Ron." The obvious, ordinary, and natural reading of this sentence is that John's purpose, or intent, was to inform the recipient that John *planned to kill Ron*, not that John's intent was simply to communicate *something* to the recipient. Of course, in the example, John *also* intended to communicate the statement to the recipient, but only as a means of delivering the specific message contained therein: a threat.

We agree with the Ninth Circuit, which did not appear to identify any alternate reading in the language from *Black*:

> The Court held in [*Black*] that under the First Amendment the State can punish threatening expression, but only if the "speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *It is therefore not sufficient that objective observers would reasonably perceive such speech as a threat of injury or death.*

*Bagdasarian*, 652 F.3d at 1116 (emphasis added) (citations omitted). The Ninth

Circuit said of the Supreme Court's definition of "true threat" in *Black*:

> The clear import of this definition is that only *intentional* threats are criminally punishable consistently with the First Amendment. First, the definition requires that "the speaker means to communicate . . . an intent to commit an act of unlawful violence." A natural reading of this language embraces not only the requirement that the communication itself be intentional, but also the requirement that the speaker intend for his language to *threaten* the victim.

*Cassel*, 408 F.3d at 631. The court in *Cassel* held that it was "bound to conclude that

speech may be deemed unprotected by the First Amendment as a 'true threat' only

upon proof that the speaker subjectively intended the speech as a threat." *Cassel*,

408 F.3d at 633 (footnote omitted). In *Bagdasarian*, the Ninth Circuit held that the

constitutionally required elements of "true threat" and "specific intent" were essential

elements in addition to the statutory elements:

> *Two elements* must be met for a statement to constitute an offense under [the statute]: objective and subjective. The *first* is that the statement would be understood by people hearing or reading it in context as a serious expression of an intent to kill or injure a major candidate for President.[15] The *second* is that the defendant intended that the statement be understood as a threat. [The defendant's] conviction under [the statute] can be upheld only if both the objective and subjective requirements are met[.]

---

[15] In other words, a true threat.

*Bagdasarian*, 652 F.3d at 1118 (citations omitted) (emphasis added).

The Tenth Circuit, after a lengthy and thorough analysis, held: "Does the First Amendment, as construed in *Black*, require the government to prove in any true-threat prosecution that the defendant intended the recipient to feel threatened? We conclude that it does." *United States v. Heineman*, 767 F.3d 970, 975 (10th Cir. 2014). The court contended *Black* had "been misconstrued by some courts that we highly respect" and held that "a careful review of the opinions of the Justices [in *Black*] makes clear that a true threat must be made with the intent to instill fear." *Id.* at 976; *id.* at 978 (alteration in original) (citation omitted) ("When the Court says that the speaker must 'mean[] to communicate a serious expression of an intent,' it is requiring more than a purpose to communicate just the threatening words. It is requiring that the speaker want the recipient to believe that the speaker intends to act violently."). This specific intent requirement is in addition to the "reasonable person" general intent requirement necessary to prove the threat was a "true threat." *Id.* at 972–73 (citations omitted) ("[T]he statement itself must be one that a reasonable person in the circumstances would understand 'as a declaration of intention, purpose, design, goal, or determination to inflict [bodily injury] on another.' And '[i]t is not necessary to show that [the] defendant intended to carry out the threat,' although the threat must be a serious one, 'as distinguished from words as mere political argument, idle talk or jest.'").

In *Elonis*, the Supreme Court did not answer the issue before it, whether the First Amendment required more than a general intent standard; instead, it reversed the Court of Appeals based solely on federal statutory construction grounds. The Court held: "Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state." *Elonis*, 575 U.S. at __, 192 L. Ed. 2d at 16. "Under [an anti-threat statute], 'wrongdoing must be conscious to be criminal.'" *Id.* "[A] defendant must be 'blameworthy in mind' before he can be found guilty, a concept courts have expressed over time through various terms such as *mens rea*, scienter, malice aforethought, guilty knowledge, and the like[,]" because "'wrongdoing must be conscious to be criminal'" and "the 'general rule' is that a guilty mind is 'a necessary element in the indictment and proof of every crime.'" *Id.* at __, 192 L. Ed. 2d at 12–3 (citations omitted). We find the analysis in *Elonis* relevant to our review because long-standing Supreme Court precedent generally requires statutes criminalizing speech to be construed *more narrowly* than criminal statutes not implicating First Amendment protections:

> "[T]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." . . . [T]he question here is as to the validity of this ordinance's elimination of the scienter requirement—an elimination which may tend to work as substantial restriction on the freedom of speech and of the press. Our decisions furnish examples of legal devices and doctrines in most applications consistent with the Constitution, *which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of*

*expression, by making the individual the more reluctant to exercise it.*

*Smith v. California*, 361 U.S. 147, 150–51, 4 L. Ed. 2d 205, 209–10 (1959) (emphasis added) (citations omitted); *Zurcher v. Stanford Daily*, 436 U.S. 547, 564, 56 L. Ed. 2d 525, 541 (1978) (citation omitted) ("Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'").

Based upon the above analysis, we hold the First Amendment requires that a specific intent element be read into anti-threat statutes. We further agree with the federal districts and hold that proof of a "true threat" requires a general intent test. We believe the general intent test should be from the viewpoint of an objective, reasonable person considering the alleged threat in full context.[16] What is required to prove the "true threat" element and the intent elements will be discussed further below. Therefore, anti-threat statutes must be construed to include, in addition to the statutory elements, the constitutionally required elements of "true threat," as determined through application of the general intent test adopted above to the definition of a "true threat," and a "specific intent" to threaten.

4. Is "True Threat" a Question of Fact or Law

---

[16] We do not believe the "reasonable person" should have to attempt to step into the shoes of either the defendant or the person allegedly threatened.

The Supreme Court has recognized "the vexing nature" of "distinguishing law from fact." *Bose*, 466 U.S. at 501, 80 L. Ed. 2d at 517 (citation and quotation marks omitted). The State contends "true threat" is a question of law that only a court can decide. The elements necessary to prove speech falls within a recognized category of "unprotected" speech, such as "actual malice" or "true threat," have been referred to as "questions of fact," "questions of law," "mixed questions of fact and law," "ultimate facts," and "constitutional facts." *See Bose*, 466 U.S. at 498–510, 517, 80 L. Ed. 2d at 510–522, 527–28. The Supreme Court generally refers to these determinations as mixed questions of fact and law or, more specifically, as "constitutional facts." *Id.*; *United States v. Hanna*, 293 F.3d 1080, 1088 (9th Cir. 2002). According to the Ninth Circuit: "Constitutional facts are facts—such as the existence of actual malice or whether a statement is a true threat—that determine the core issue of whether the challenged speech is protected by the First Amendment." *Id.* "[Q]uestions of 'constitutional fact' have been held to require de novo review." *Jacobellis v. Ohio*, 378 U.S. 184, 190 n.6, 12 L. Ed. 2d 793, 799 n.6 (1964) (citations omitted); *Bose*, 466 U.S. at 508 n.27, 80 L. Ed. 2d at 522 n.27. For this reason, appellate courts will conduct *de novo* whole record review in First Amendment cases, even though "'the jury was properly instructed and there is some evidence to support its findings[.]'" *Id.* at 506–07, 80 L. Ed. 2d at 520-21 (citation omitted).

Therefore, whatever terminology is applied to the issue of whether speech falls within one of the "unprotected" categories, that question is *usually* for the jury to determine in the first instance:

> If it were clear, as a matter of law, that the speech in question was protected, [*i.e.*, not a true threat,] we would be obligated to remand not for a new trial, but for a judgment of acquittal. If, on the other hand, "there were material facts in dispute or it was not clear that [the communications] were protected expression or true threats," it was appropriate to submit the issue, in the first instance, to the jury.

*Hanna*, 293 F.3d at 1087 (citations omitted); *see also id.* at 1088 n.5.

### 5. Proving a "True Threat"

### a. **Definition**

In order to prove a "true threat," the State and the trial court must first know the proper definition of "true threat." "[T]he First Amendment does not permit the government to punish speech merely because the speech is forceful or aggressive. What is offensive to some is passionate to others. The First Amendment . . . requires [the trier of fact] . . . to differentiate between 'true threat[s],' and protected speech." *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996) (alteration in original) (citation omitted). The Supreme Court in *Watts* did not provide a definition of "true threat," but made clear that speech may not be punished simply because it includes "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"; because it is "vituperative, abusive, and inexact"; or because it

constitutes "a kind of very crude offensive method of stating a political opposition to" a public official. *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667 (citations omitted). It is clear that "threats" that amount to nothing more than jest, idle talk, or political hyperbole are protected speech. *Id.*; *United States v. Spruill*, 118 F.3d 221, 228 (4th Cir. 1997). "True threats" do not include "the kind of hyperbole, rhetorical excesses, and impotent expressions of anger or frustration that in some contexts can be privileged even if they alarm the addressee." 16A Am. Jur. 2d Constitutional Law § 527 (footnote omitted).

A "true threat" "instills in the addressee a fear of . . . serious personal violence from the speaker, it is unequivocal, and it is objectively likely to be followed by unlawful acts[.]" *Id.* The Second Circuit noted that the purpose of the *Watts* "true threat" requirement was to

> insure that only unequivocal, unconditional and specific expressions of intention . . . to inflict injury may be punished—only such threats, in short, as are of the same nature as those threats which are . . . 'properly punished every day under statutes prohibiting extortion, blackmail and assault without consideration of First Amendment issues.'

*United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976) (citation omitted). "To fall outside of the First Amendment's protections, a threat must 'according to its language and context convey[] a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected vehement, caustic, unpleasantly sharp

attacks on government and public officials.'" *United States v. Dillard*, 795 F.3d 1191, 1199 (10th Cir. 2015) (alteration in original) (citations and quotation marks omitted).

As noted, *Black* is the source of the definition of "true threats" currently applied in most, if not all, "true threats" cases:

> "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protect[s] individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

*Black*, 538 U.S. at 359–60, 155 L. Ed. 2d at 552 (alteration in original) (citations omitted). We construe the definition set forth in *Black* within the context of "true threat" analysis laid out above. A "true threat" is a statement where the speaker intends to communicate, to a particular individual or group of individuals, a threat, being "a serious expression of an intent to commit an act of unlawful violence[.]" *Id.*

### b. **Intent**

As held above, we adopt the standard set forth by the Ninth Circuit, which includes both a general intent standard to prove a "true threat," and a specific intent standard to prove a defendant's subjective intent to threaten a person or group of

persons by communicating the alleged threat. *Bagdasarian*, 652 F.3d at 1118 (citations omitted) ("Two elements must be met for a statement to constitute an offense under [an anti-threat statute]: objective and subjective.").

### c. **Context**

The Supreme Court has long recognized that determination of whether a defendant's "speech" falls into one of the categories of "unprotected" speech, such as "true threats," must be made considering the context in which the communication was made; *i.e.*, all the facts surrounding the communication of the challenged speech. *See, e.g., F.C.C. v. Pacifica Found.*, 438 U.S. 726, 750, 57 L. Ed. 2d 1073, 1094 (1978) ("[C]ontext is all-important[;] [t]he concept requires consideration of a host of variables."); *Denver Area Educ. Tel. v. F.C.C.*, 518 U.S. 727, 752, 135 L. Ed. 2d 888, 908 (1996) (citations omitted) ("[W]hat is 'patently offensive' depends on context[.]"). As with the other "unprotected" categories, the Supreme Court looks to the context of an alleged threat in order to determine whether it constitutes a "true threat." *Watts*, 394 U.S. at 707–08, 22 L. Ed. 2d at 667.

Federal circuit courts have consistently held that determination of whether a "threat" rises to the level of a "true threat" must be determined not only based on the specific language used, or acts undertaken, but also by the context within which the alleged threat was made. "Determining whether a statement amounts to a true threat requires 'a fact-intensive inquiry, in which the language, the context in which

the statements are made, as well as the recipients' responses are all relevant.'" *United States v. Wheeler*, 776 F.3d 736, 743 (10th Cir. 2015) (citations omitted). The Ninth Circuit recognized in 2002: "We, and so far as we can tell, other circuits as well, consider the whole factual context and 'all of the circumstances' in order to determine whether a statement is a true threat." *Planned Parenthood v. Amer. Coal. of Life*, 290 F.3d 1058, 1078 (9th Cir. 2002) (citation omitted); *see also id*. at 1078–79 (cases cited therein); *United States v. Khorrami*, 895 F.2d 1186, 1193 (7th Cir. 1990) (citation omitted) ("In *Hoffman* we emphasized the importance of the context of a statement in determining whether it is a true threat or merely political hyperbole."). The Fourth Circuit has also recognized the "*Watts* requirement that the defendant's statement be examined in its full context[.]" *Patillo*, 431 F.2d at 296 (citation omitted); *White II*, 810 F.3d at 220. State courts also require consideration of context. *See, e.g.*, *Colorado v. McIntier*, 134 P.3d 467, 472 (Colo. App. 2005) ("The critical inquiry is 'whether the statements, viewed in the context in which they were spoken or written, constitute a "true threat"'"); *Harrell v. Georgia*,778 S.E.2d 196, 200–01 (Ga. 2015). Therefore, we hold:

> Two elements must be met for a statement to constitute an offense under [an anti-threat statute]: objective and subjective. The first is that the statement would be understood by people hearing or reading it *in context* as a *serious expression of an intent to kill or injure* [the person or persons from an identified group]. The second is that the defendant *intended* that the statement *be understood as a threat*. Because [a defendant's] conviction under [an

anti-threat statute] can be upheld only if both the objective and subjective requirements are met, neither standard is the obvious starting point for [appellate] analysis, and . . . resolution of either issue may serve as an alternate holding.

*Bagdasarian*, 652 F.3d at 1118 (emphasis added) (citations omitted).

## 6. Jury Instructions

As recognized by our Supreme Court, correct and thorough jury instructions are fundamental to a fair and reliable trial:

> "The jury charge is one of the most critical parts of a criminal trial." "The purpose of . . . a charge to the jury is to give a clear instruction to assist the jury in an understanding of the case and in reaching a correct verdict," including how "the law . . . should be applied to the evidence[.]" As a result, the trial court has a duty "to instruct the jury on all substantial features of a case raised by the evidence." In the event that a "defendant's request for [an] instruction [is] correct in law and supported by the evidence in the case, the trial court [is] required to give the instruction, at least in substance." "[I]n giving jury instructions," however, "'the court is not required to follow any particular form,' as long as the instruction adequately explains 'each essential element of the offense.'"

*State v. Fletcher*, 370 N.C. 313, 324–25, 807 S.E.2d 528, 537 (2017) (alterations in original) (citations omitted). Complete and proper jury instructions are vital for the "essential feature of a jury[,] . . . [its] interposition between the accused and his accuser." *Williams v. Florida*, 399 U.S. 78, 100, 26 L. Ed. 2d 446, 460 (1970).

"[T]he essential Sixth Amendment inquiry is whether a fact is an element of the crime." *Alleyne*, 570 U.S. at 114, 186 L. Ed. 2d at 329. "The touchstone for

determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' . . . of the charged offense." *Id.* at 107, 186 L. Ed. 2d at 324 (citations omitted). "'The general rule is that what is necessary to be charged as a descriptive part of the offense[, an essential element,] is required to be proved'" by the State beyond a reasonable doubt. *State v. Mather*, 221 N.C. App. 593, 599, 728 S.E.2d 430, 434 (2012) (quoting *State v. Connor*, 14 N.C. 700, 704, 55 S.E. 787, 789 (1906)). "This Court . . . reviews de novo the trial court's jury instructions regarding the elements of the offense at issue." *State v. Watterson*, 198 N.C. App. 500, 503, 679 S.E.2d 897, 899 (2009) (citation omitted).

### a. **Requirements**

Failure to submit every essential element of a crime for jury determination violates the defendant's constitutional rights:

> The Sixth Amendment provides that those "accused" of a "crime" have the right to a trial "by an impartial jury." This right, in conjunction with the Due Process Clause, requires that each element of a crime be proved to the jury beyond a reasonable doubt. The substance and scope of this right depend upon the proper designation of the facts that are elements of the crime.

*Alleyne*, 570 U.S. at 104–05, 186 L. Ed. 2d at 322 (citations omitted). As discussed above, a "true threat" is a "constitutional fact" that must be proven by the State beyond a reasonable doubt. Therefore, "true threat" is an *essential element* of

N.C.G.S. § 14-16.7(a), and the trial court is constitutionally prohibited from deciding

the existence of a "true threat" as a matter of law:[17]

> At stake . . . are constitutional protections of surpassing
> importance: the proscription of any deprivation of liberty
> without "due process of law," Amdt. 14, and the guarantee
> that "[i]n all criminal prosecutions, the accused shall enjoy
> the right to a speedy and public trial, by an impartial jury,"
> Amdt. 6. Taken together, these rights indisputably entitle
> a criminal defendant to "a *jury determination that [he] is*
> *guilty of every element of the crime with which he is*
> *charged*, beyond a reasonable doubt."

*Apprendi*, 530 U.S. at 476–77, 147 L. Ed. 2d 435, 447 (emphasis added) (citations

omitted); *see also Lockhart*, 382 F.3d at 449–50 (listing "true threat" as an element

required by the First Amendment).

Nonetheless, the State argues that the trial court has no obligation to instruct

the jury on any aspect of "true threat" jurisprudence in an anti-threat trial. The State

relies on the Supreme Court's opinion in *Dennis*, which, according to the State, "held

the <u>courts</u>, not juries, decide whether speech is protected by the First Amendment"

and, therefore, the trial court, and not the jury, should determine whether a

communication is a "true threat." While it is true that the constitutionality of

N.C.G.S. § 14-16.7(a), facially or as applied, is ultimately decided by "the courts," the

State's additional argument that the trial court, not the jury, should determine

whether the facts of a case support a finding of a "true threat" in the first instance is

---

[17] The trial court can, of course, determine the *non-existence* of a true threat as a matter of law, prior to, during, or following the evidentiary portion of the trial.

counter to relevant Supreme Court precedent and overwhelming consensus found in federal and state court opinions. In fact, we cannot locate a single jurisdiction that does not send to the jury, in the first instance, the question of whether a defendant's "speech," considered in context, falls into one of the established categories of "unprotected" speech.

The Supreme Court has regularly considered whether the *jury* correctly determined that the government, or the plaintiff, proved elements imposed by the First Amendment, even when those elements were not included in the language of the relevant statute. In fact, the Supreme Court's review of the constitutionality of a state statute may be dictated by the interpretation of the statute as stated in the jury instructions: "[T]he gloss which [the State] placed on the ordinance [by the jury instruction] gives it a meaning and application which are conclusive on us. . . . As construed and applied it at least contains parts that are unconstitutional." *Terminiello v. City of Chicago*, 337 U.S. 1, 5, 93 L. Ed. 1131, 1135 (1949); *see also id.* ("The ordinance as construed by the trial court [in its jury instructions] seriously invaded [First Amendment protections]. It permitted conviction of petitioner if his speech stirred people to anger, invited public dispute, or brought about a condition of unrest."); *Black*, 538 U.S. at 364–65, 155 L. Ed. 2d at 556 ("As interpreted by the jury instruction, the provision chills constitutionally protected political speech because of the possibility that a State will prosecute—and potentially convict—somebody

engaging only in lawful political speech at the core of what the First Amendment is designed to protect.").

The Tenth Circuit expressly rejected the State's reading of *Dennis*:

> Citing *Dennis*, [the defendant] also argues the district court should have resolved his First Amendment defense as a matter of law rather than submit the matter to the jury. . . . [In *Dennis*,] [t]he trial court denied defendants' motion to dismiss, which was based on their assertion that the statute was unconstitutional. . . .

> *Dennis* is readily distinguishable. Here, [the defendant] is not contesting the [facial] constitutionality of [the anti-threat statute]. Rather, he asserts only that his particular speech was political in nature. We consistently have held that whether a defendant's statement is a true threat or mere political speech is a question for the jury. If there is no question that a defendant's speech is protected by the First Amendment, the court may dismiss the charge as a matter of law.

*United States v. Viefhaus*, 168 F.3d 392, 396–97 (10th Cir. 1999) (citations omitted).

The Fourth Circuit has repeatedly acknowledged that "'[g]enerally, what is or is not a true threat is a jury question[.]'" *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 692 (4th Cir. 2018) (citation omitted). The Fourth Circuit has cited *Dennis* for the proposition that a defendant is "entitled to have the issue as to whether his statements constituted a [true] 'threat' properly submitted to the jury." *Alexander*, 418 F.2d at 1206. Every other federal circuit is in agreement. *See, e.g., United States v. Stock*, 728 F.3d 287, 297–98 (3rd Cir. 2013). Courts from other states have also addressed the "true threat" jury instruction issue. *See Johnston*, 127 P.3d at 712

(agreeing with "*Black*, our decisions . . ., and the body of federal case law[,]" which have held anti-threat statutes "must be limited to true threats . . . and the jury must be instructed accordingly"); *see also, e.g., North Dakota v. Brossart*, 858 N.W.2d 275, 284–85 (N.D. 2015).

The United States Constitution demands that the State prove *every* element of a criminal offense beyond a reasonable doubt to a jury, absent proper waiver of a jury trial. Sixth and Fourteenth Amendment "rights indisputably entitle a criminal defendant to 'a *jury determination* that [he] is guilty of *every element of the crime* with which he is charged, beyond a reasonable doubt.'" *Apprendi*, 530 U.S. at 476–77, 147 L. Ed. 2d at 447 (citations omitted) (emphasis added); *see also In re Winship*, 397 U.S. 358, 364, 25 L. Ed. 2d 368, 375 (1970). We hold that the trial court must properly and fully instruct the jury on all the required elements of anti-threat statutes such as N.C.G.S. § 14-16.7(a), including the element of "true threat," along with its associated intent elements, both general and specific.

Our Supreme Court has recognized that the trial court must instruct the jury in a manner that ensures the defendant's First Amendment rights will not be violated. *State v. Leigh*, 278 N.C. 243, 252, 179 S.E.2d 708, 713 (1971). In *Leigh*, the Court granted the defendant a new trial because "[n]owhere in the charge did the trial judge explain the law or apply the law to the evidence concerning [the] defendant's contention [that his speech was protected by the First Amendment]." *Id.*

In order to obtain a constitutional conviction for threatening a court officer pursuant to N.C.G.S. § 14-16.7(a), the State must prove, beyond a reasonable doubt, that: (1) the defendant; (2) knowingly and willfully; (3) made a threat; (4) constituting a "true threat," meaning a statement "that an ordinary, reasonable [person] who is familiar with the context in which the statement [wa]s made would interpret as a serious expression of an intent to do harm";[18] (5) to a court official; (6) knowing the court official was a court official; and (7) when the defendant communicated the statement, the defendant specifically intended the statement to be understood by the court officer as a real threat expressing the defendant's intention to carry out the actions threatened. N.C.G.S. § 14-16.7(a); *White II*, 810 F.3d at 221; *Cassel*, 408 F.3d at 632–33.

## b. **Prejudice**

Failure to properly instruct a jury on a constitutionally required element of a crime is subject to harmless error review. *See Neder v. United States*, 527 U.S. 1, 11–3, 144 L. Ed. 2d 35, 48–50 (1999). "The standard of review for alleged violations of constitutional rights is *de novo*." *State v. Graham*, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009) (citation omitted).

> [The test] is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *[S]ee Delaware v[.] Van Arsdall*, [475 U.S. 673, 681, 89 L. Ed. 2d 674, 684 (1986)] ("[A]n

---

[18] *White II*, 810 F.3d at 221.

otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

*Neder*, 527 U.S. at 15–6, 144 L. Ed. 2d 35 at 51 (citations omitted); *State v. Hammonds*, 370 N.C. 158, 167, 804 S.E.2d 438, 444 (2017) (citing N.C.G.S. § 15A-1443 (2015)) ("'A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.'").

## III. Defendant's Appeal

### A. *As Applied Challenge/Whole Record Review*

Based upon our holdings above, we conduct an independent whole record review to determine whether Defendant's Facebook posts constituted a "true threat" to kill D.A. Welch, and whether Defendant subjectively intended his Facebook posts to reach D.A. Welch for the purpose of causing her to believe that Defendant intended to kill her. *Milkovich*, 497 U.S. at 17, 111 L. Ed. 2d 17 (citations omitted) (the Supreme Court has "determined that 'in cases raising First Amendment issues . . . an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression"'"); *Bagdasarian*, 652 F.3d at 1118 (establishing the State must prove a "true threat" pursuant to both a reasonable

person general intent standard considering the context, as well as the defendant's specific intent to threaten the alleged victim).

### 1. Plain Language Review of the Alleged Threats

We first examine each "threat" alleged in the indictment based *solely* upon the plain language; then we examine the alleged threats in context. *See In re White*, 2013 WL 5295652, *44 (E.D.Va. 2013). Defendant's indictment alleged five "threats," and reads in relevant part:

> [D]efendant . . . did knowingly and willfully make a threat to kill Ashley Welch, District Attorney, . . . by posting the following on Facebook: "[P]eople question why a rebellion against our government is coming? I hope those that are friends with her share my post because she will be the first to go. . . . I will give them both the mtn justice they deserve . . . [I]f our head prosecutor won't do anything then the death to her as well . . . [I]t is up to the people to administer justice! I'm always game to do so. They make new ammo everyday! . . . It is time for old Time mtn justice!"

At trial, the State argued that only five of Defendant's posts, and no posts from Defendant's Facebook friends, should be admitted into evidence, contending: "We believe those are the five relevant texts. It's the State's position that the other texts . . . are not relevant." "The question is under the elements and under the statute did [D]efendant threaten to kill [D.A. Welch]. The context of that conversation is not relevant[.]" Further, the five posts did not fully align with the posts containing the alleged threats in the indictment. The State told the jury in its closing argument: "We had Detective Stewart read you . . . the five posts that the State finds at issue."

One of the five posts constituting State's Exhibits 1 – 5 did not include any of Defendant's comments from the indictment, and one of the comments included in Defendant's indictment was not included in any of the posts the State argued were "relevant."

However, on appeal, the State argues context: "[T]he content of [Defendant's] posts and the surrounding context objectively show that [he] made true threats." "The content of [Defendant's] posts objectively threaten[ed] harm to [D.A.] Welch. [Defendant] posted":

> • "Death to our so called judicial system . . . . If our head prosecutor won't do anything then the death to her as well."[19]
>
> • "[S]he will be the first to go, period and point made."[20]
>
> • "[I]t is up to the people to administer Justice! I'm always game to do so. They make new ammo everyday!"

The State narrows its focus to two of the three alleged threats listed above, stating "[Defendant's] posts, 'death to [her],' and 'she will be the first to go,' speak for themselves. He made true threats to kill [D.A.] Welch." The State does not argue on appeal that the two comments referring to "mountain justice" constituted threats to

---

[19] These two statements are not contained in the same post. Although the "Death to our so called judicial system" comment is included in one of the posts the State had Detective Stewart read into evidence, nothing in that post was included in the indictment. Considering these two comments together could be appropriate in a contextual analysis, since both use the particular "death to" language. However, it is not appropriate to combine comments from different posts as if they were from the same post.

[20] The "period and point made" language was not included in the indictment.

kill D.A. Welch; these comments are not even referenced in the State's "true threat" argument, and we agree that they are of minimal relevance.

Solely considering the plain language of the "threats" alleged in the indictment, we agree with the State and find only two of the alleged threats merit closer analysis. The following three alleged threats do not contain any language indicating any threat, much less a "true threat," to kill D.A. Welch:  (1) "I will give them both the mtn justice they deserve[,]" (2) "it is up to the people to administer justice!  I'm always game to do so.  They make new ammo everyday![,]" and (3) "It is time for old Time mtn justice!"[21]  These comments are vague and do not indicate Defendant had any intention to do anything specific to anyone at any particular time.  These comments contain nothing that "an ordinary, reasonable [person] . . . would interpret . . . as a serious expression of an intent to" kill D.A. Welch, *White II,* 810 F.3d at 221 (citation omitted), and nothing in these comments would support a jury finding that by posting them on his Facebook page Defendant had the specific intent to threaten D.A. Welch, *i.e.*, that Defendant *intended* D.A. Welch to *believe* he was *actually* planning to kill her. *Bagdasarian*, 652 F.3d at 1118.  We therefore look to the plain language of the remaining two alleged threats.

First:  "[P]eople question why a rebellion against our government is coming?  I hope those that are friends with her share my post because she will be the first to go."

---

[21] This alleged threat from the indictment was not even included in the five posts the State introduced as the five "relevant" posts, State's Exhibits 1 – 5.

The meaning of these words is simply too vague to be considered a "true threat." *Yates*, 354 U.S. at 327, 1 L. Ed. 2d at 1380 ("Vague references to 'revolutionary' or 'militant' action of an unspecified character, which are found in the evidence, might in addition be given too great weight by the jury in the absence of more precise instructions."). The first sentence is clearly political hyperbole and protected speech. *Watts*, 394 U.S. at 707–08, 22 L. Ed. 2d at 667. The second sentence includes the words "she will be the first to go[,]" which is an apparent reference to D.A. Welch. However, even on its face this language is not clearly a threat, much less a "true threat." "She will be the first to go" could mean "she will be the first to die"; but even if that were its meaning, there are no specifics that would suggest an actual intent that D.A. Welch be killed, by Defendant or anyone else, and there is nothing in this statement indicating, assuming Defendant actually hoped for D.A. Welch's death, that *he* had any intent to kill her.[22] Further, if D.A. Welch "will be the first to go," it would only occur during a "rebellion against our government[.]" The alleged "threat" is contingent upon an event that no reasonable person would believe was ever likely to occur. *Id.* at 707-08, 22 L. Ed. 2d at 667 (citation omitted) (even the *Ragansky* test

---

[22] We want to make clear the Supreme Court has held there is no need to prove that Defendant actually intended to carry out any threat to kill D.A. Welch. However, the alleged threat must be such that a reasonable person would understand it as a real threat to kill D.A. Welch in order for it to rise to the level of a "true threat." That is, the content of Defendant's communication must at least *reasonably appear* to express Defendant's intent to carry out the threat; and Defendant must have also intended his communication to be *received* by D.A. Welch as a real threat to kill her, even if Defendant had no intention to actually harm her. *Bagdasarian*, 652 F.3d at 1118.

required the speaker to have "uttered the charged words with 'an apparent determination to carry them into execution'"). In addition, this alleged "threat" could also refer to a non-violent "rebellion," *e.g.*, mass protests of the people leading to D.A. Welch's resignation, a "rebellion" at the ballot box in the next election, or any number of circumstances that do not include Defendant murdering D.A. Welch.

Second: "[I]f our head prosecutor won't do anything then the death to her as well." This is the only comment in the indictment that includes language associating "death" with D.A. Welch. However, the language of this comment does not evince "a serious expression of [Defendant's] intent" to kill D.A. Welch. *White II*, 810 F.3d at 221 (citation omitted). It is conditional on its face, even in the truncated form presented in the indictment: "*if* [D.A. Welch] won't do anything *then* the death to her as well." (Emphasis added). Meaning if D.A. Welch did *"something,"* there would be no longer be a basis for the "then the death to her as well" sentiment. Nothing in the comment indicated *what* D.A. Welch would have to do, or fail to do, to warrant "the death to her as well" sentiment. Nothing in the comment indicated an actual plan to kill D.A. Welch, even if she failed to "do something" at some undetermined time in the future. Nor does the comment indicate that, if someone were actually going to act on whatever "the death to her as well" comment might suggest, it would be Defendant. Further, there were no specifics such as time, manner, place, ability, preparation, or other facts that might allow a reasonable person to read Defendant's

words as a "true threat" to kill D.A. Welch. *See United States v. Roberts*, 915 F.2d 889, 890–91 (4th Cir. 1990). Conducting a plain language review of the "threats" alleged in the indictment, we hold that, standing alone or read together, the plain language of the alleged threats does not constitute "a serious expression of [Defendant's] intent" to kill D.A. Welch. *White II*, 810 F.3d at 221 (citation omitted).

We reach the same conclusion if we expand our review beyond the five comments included in the indictment and include State's Exhibits 1 – 5 in their entirety. These posts also included comments expressing: Defendant's disgust that the parents would not be prosecuted for their child's death; his disdain for "our judicial system"; distrust and disgust associated with "the government and the judicial system" and "politicians," declaring: "Death to our so called judicial system since it only works for those that are guilty!" One comment stated: "I will give them both the mountain justice they deserve[,]" apparently directed toward the parents, then stated: "I'm tired of this political bullshit." Another comment said: "Now U wonder why I say if I am raided for whatever reason like the guy on smoke rise was[, w]hen the deputy ask me is it worth it[,] I would [] say with a Shotgun Pointed at him and a ar15 in the other arm was it worth to him?" This comment suggested Defendant had posted prior, unrelated comments on Facebook indicating he would meet any "raid" of his home with deadly force. Defendant also told his Facebook friends: "What I do Training wise from this point is ur fault[,]" the meaning of which is unclear, and

declared: "U want me come and take me[.]" Defendant also invited someone, presumably law enforcement, to "raid my house for communicating threats and see what they meet." Defendant completed this post with an apparent metaphor involving fish and a pond. Defendant replied to one of Burch's comments by claiming that D.A. Welch would never "reply" to the accusations because she wasted her "6 digit income" smoking outside, and because "[s]he won't try a case unless it gets her tv time. Typical politician." Defendant posted he was "sure my house is being Monitored right about now! I really hope They are ready for what meet them at the front door." He made a comment stating the "coming rebellion" "can start at my house. . . . . If the courts won't do it as have been proven. Then yes it Is up to the people to administer justice!" Defendant stated he was "always game to do so" and "[t]hey make new ammo everyday!" Defendant opined that his Facebook friends might "need to learn what being free is verse being a puppet of the government" because then they "might actually be happy!" Defendant made a vague statement about his Facebook friends all knowing "someone who will like this Comment" or "post." Finally, State's Exhibit 5 included another attack on "the court," and "most importantly [the] western nc justice system," calling it "useless." Defendant declared "[i]t is time for old Time mtn justice!" This post concluded: "Now let Them knock on my door[.]"

These posts were full of hyperbolic rants against the courts, the judicial system, the government and politics in general, as well as a taunt directed toward anyone, presumably law enforcement, who would attempt to "raid" his house or property. Although these posts provided context to the alleged threats which, according to the State at trial, was irrelevant, the statements in these additional comments did not include any "true threats" to do anything to D.A. Welch.

2. Context of Defendant's Facebook Posts

The "language itself" of the alleged threats demonstrated no more than that Defendant was angry about the decision not to prosecute the parents and, in response, he took to Facebook to rant about politicians, local government, the local judicial system, and D.A. Welch. *See Citizens United*, 558 U.S. at 349, 175 L. Ed. 2d at 788. In other words, though the language used was extreme, ugly, and upsetting, it was political hyperbole. *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667. Next, we review the whole record to determine whether, considering all the facts surrounding Defendant's posting of these comments, they rise to the level of a "true threat." Defendant's Facebook posts, as well as his "friends'" posts, speak for themselves. Therefore, our review consists of applying the dictates of the First Amendment to the uncontested evidence, a question of law, which we conduct *de novo*. *Shackelford*, __ N.C. App. at __, 825 S.E.2d at 695; *Bly*, 510 F.3d at 457–58.

We first note a fatal error in the State's argument: none of the legal requirements the State argues apply in this matter were conveyed to the jury, so it could not have conducted the "Fourth Circuit's objective test for true threats" or any other test. Addressing the merits of the State's argument, it contends "proof that [D]efendant ha[d] access to weapons" was context supporting a finding of a "true threat," stating that Defendant "made clear in his posts that he had more than enough firepower to carry out his threats to kill [D.A.] Welch. He explained that he was not afraid to use his firearms: He said he 'would open every gun' that he has." However, the State never proved that Defendant *actually* owned any firearms or ammunition; did not elicit any testimony from D.A. Welch that she knew, or believed, Defendant owned firearms; and did not show that Defendant's alleged firearms elicited fear or concerned her in any way. If law enforcement considered Defendant or his alleged access to "more than enough firepower to carry out his threats to kill [D.A.] Welch" as a realistic threat, presumably they would have investigated further and sought an order to remove any firearms from Defendant's possession if warranted. Further, the comment in which Defendant stated he "would open every gun" *was not directed toward D.A. Welch*; it was directed toward any hypothetical law enforcement officers who attempted to raid his home, "*for whatever reason* like the guy on smoke rise[.]" (Emphasis added).

The State argues on appeal that Defendant "bragged in his posts about the firearms that he could use to shoot [D.A. Welch]." However, Defendant never indicated that he had any intention of shooting D.A. Welch or using any firearms against her in any manner. He only referenced firearms in connection with hypothetical "raids" on his house: "Now U wonder why I say if I am raided for whatever reason like the guy on smoke rise[,]" "[I] would [meet 'the deputy'] with a Shotgun Pointed at him and a ar15 in the other arm[.]" In this comment, Defendant indicated that he had *previously* spoken of his intent to respond to any "raid" of his property with armed resistance, *prior to making any of the allegedly threatening comments about D.A. Welch*. Defendant never indicated any belief that D.A. Welch would "raid" his home.

Next, the State contends "the evidence shows that both [D.A.] Welch and law enforcement responded as if [the alleged] threats were real." Courts consider the "reaction of the audience upon [the] utterance" of the alleged threat and how seriously the threat is received. *In re White*, 2013 WL 5295652 at \*45; *see also United States v. Davis*, 876 F.2d 71, 73 (9th Cir. 1989) (considering recipient's state of mind as well as actions taken in response relevant to determination of a true threat). D.A. Welch showed some concern by contacting her office and having her real estate agent remove information about her house from the Internet. However, she also testified that she did *not* feel the need to have personal protection, she was *not* concerned about

returning to work the next day, even knowing that Defendant would likely also be in the adjacent building, and she apologized to officers whom she believed were keeping an eye on her at the courthouse, telling them their extra vigilance was not necessary. D.A. Welch's actions and her testimony demonstrated only a low level of concern in general, and neither her conduct nor her testimony suggested that she believed Defendant's Facebook comments to have been serious expressions of Defendant's intent to kill her, or that she was seriously frightened of Defendant.

"[T]he seriousness with which . . . law enforcement took" the alleged threat is also an important contextual factor. *In re White*, 2013 WL 5295652 at \*45 (citing *White I*, 670 F.3d at 512–13); *see also Dinwiddie*, 76 F.3d at 925. Though not on duty at the time, Detective Stewart's concerns are more appropriately considered here. The record evidence indicates that she was the only one of Defendant's Facebook friends who was concerned about Defendant's posts. Detective Stewart did not express any concern directly to Defendant, either on Facebook or by contacting him in person. Instead, she waited over an hour before contacting D.A. Welch and the sheriff. It is also relevant that Detective Stewart had personal relationships with both D.A. Welch and the sheriff due to her job, and that she was a detective. It is more likely that a person will contact someone with whom they have a relationship to convey information that causes them even mild concern, and law enforcement officers are trained to react to things that the general public may ignore. Detective

Stewart's reaction should be considered from the viewpoint of a reasonable law enforcement officer and friend of D.A. Welch, not as a general "reasonable person."

The sheriff's response was to *ask* D.A. Welch if she wanted a deputy to come to her house, an offer that was declined. The sheriff apparently did not consider the likelihood of any danger to D.A. Welch to be significant enough to act without her request. The evidence suggests law enforcement did not consider Defendant's comments serious enough to warrant an immediate response, as they did not attempt to locate or contact him that evening, nor the next morning, even though D.A. Welch worked next to Defendant, and they both frequented the shared smoking area. As the State concedes, Defendant "knew exactly where to find [D.A.] Welch" and "would have had easy access to [D.A.] Welch while she was outside and unguarded." Nobody was assigned to keep an eye on Defendant or D.A. Welch to ensure D.A. Welch's security.[23] The SBI was the first agency to contact Defendant about the posts, and that was not until the afternoon of 25 August 2016, at Defendant's place of work.

According to the record evidence, law enforcement did not contact Burch. Burch's comments were clearly not "true threats," but if Burch believed that Defendant, by posting his comments, "mean[t] to communicate a serious expression of an intent to" kill D.A. Welch, *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552 (citation omitted), Burch *was* indicating his eagerness to join Defendant in that endeavor.

---

[23] D.A. Welch did testify to her belief that officers in the courthouse were staying close to her, presumably as protection.

Further, the record suggests that the parents were not contacted, though the "give them both the mtn justice they deserve" comment was likely directed to the parents, not D.A. Welch. If officers suspected that Defendant or Burch, or both, were truly threatening to exact some kind of "vigilante" or "mountain" justice on the parents, it is presumed that they would have taken measures to protect, or at least inform, the parents.

Further, the most overt "threats" were directed at law enforcement officers, including threatening to "open every gun I have" on any law enforcement that came to Defendant's "door." If law enforcement considered Defendant to be serious in his threat to "open every gun [he had,]" logically, they would have investigated Defendant about those comments, and demonstrated greater concern in general. As noted above, law enforcement did not respond in a manner suggesting they believed Defendant's Facebook posts indicated an actual threat to kill D.A. Welch, nor that they were concerned about Defendant potentially possessing an assortment of firearms. Defendant was not charged or investigated in response to his threats toward law enforcement officers. These comments demonstrate that Defendant knew how to speak more directly about killing someone than using comments like "mountain justice," "she will be the first to go," and "the death to her as well." Since it was the State's burden to prove not only a "threat," but a "true threat," this evident lack of concern on the part of authorities weighs against a finding that a reasonable person

reading Defendant's posts, understanding the full context surrounding their communication, would believe that Defendant "mean[t] to communicate a serious expression of an intent to" kill D.A. Welch. *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552 (citation omitted).

The relationship between the speaker and the recipient of the alleged threat is highly relevant in "true threat" analysis. *Id.* However, Defendant's posts were not made in the "context of a volatile or hostile relationship[.]" *In re S.W.*, 45 A.3d 151, 157–60 (D.C. 2012). D.A. Welch testified she interacted with Defendant on a daily basis at work and their interactions were never unusual or disconcerting. D.A. Welch testified she had never prosecuted Defendant or any of his family members; that Defendant had always been polite; and that Defendant had never acted in an inappropriate or threatening manner with her. Detective Stewart also testified that the interactions she had witnessed between Defendant and D.A. Welch were polite and non-threatening, Defendant had even requested a bumper sticker from D.A. Welch in order to support her election bid. Defendant told Agent Schick that he voted for D.A. Welch, and still considered her to be a good district attorney. Courts consider the speaker's history of threatening the recipient, and whether the recipient had reason to believe the speaker was prone to violence. *Id.*, *White I*, 670 F.3d at 513. The record is clear that Defendant had never threatened D.A. Welch, and it contains

no suggestion that he had ever threatened anyone else, was prone to violence, or was likely to follow through with any allegedly violent threat.

The State also argues on appeal that Defendant "knew [D.A.] Welch. They worked in the same small town[,]" Defendant "knew where to find [D.A.] Welch, for example, on her smoke breaks and in the courthouse parking lot. He worked in an office near that same courthouse. He would have had easy access to Welch while she was outside and unguarded." The State contends "proof that a defendant knows where to find a person makes the defendant's threats against that person objectively more serious." However, when we consider the fact that Defendant knew where D.A. Welch worked, and where she took her smoke breaks, along with law enforcement's decision not to monitor Defendant or D.A. Welch, the State's argument is undercut. Law enforcement did not act in a manner suggesting Defendant was considered a serious threat to D.A. Welch. Further, since D.A. Welch was the District Attorney, her place of work would have either been known, or easily discoverable, by anyone, making Defendant's knowledge of this fact of little relevance.

The State contends that Defendant "even conceded in his posts that he was 'communicating threats.'" It is true that after making the "then the death to her as well" comment, Defendant stated: "Now raid my house for communicating threats and see what they meet." This kind of language can add to context supporting a finding of a "true threat," but it must also be read in context; it does not *per se* elevate

every utterance to a "true threat." Nor do we typically allow defendants to define the crimes for which they are charged. More importantly, because this is the general intent portion of our review, Defendant's actual mindset is just one of many contextual factors that may be useful in determining whether a reasonable person, applying the general intent standard, would objectively determine Defendant's posts contained a "true threat."

Finally, the State contends that Defendant "encouraged those reading his threats to communicate them directly to [D.A.] Welch." The manner of conveying the alleged threat can be very relevant. A statement communicated directly and "privately" to the intended recipient is more suggestive of a serious threat than one made publicly to a group that does not include the "intended recipient." *Id.*; *U.S. v. Syring*, 522 F.Supp.2d 125, 134 (D.D.C. 2007). Defendant never communicated any statement directly to D.A. Welch. He posted the comments while at home making dinner for his family. Defendant made two relevant comments, first: "I have friends on fb whom see this. I hope they do! Death to our so called judicial system since it only works for those that are guilty!" This post is a rant against "the government and the judicial system," and included Defendant's comment that he would respond to any "deputy" sent to "raid" his home with firepower. This post does not mention D.A. Welch, and there is no suggestion that Defendant wanted anyone to share this post with D.A. Welch. The second comment contained no threatening language at all. It

was in response to Sammons' comment: "I wouldn't expect that from Franklin but maybe Asheville[.]" Defendant informed Sammons that D.A. Welch's district did not include Asheville and told Sammons: "This is how politics works. That's why my harsh words to her and any other that will Listen and share it to her fb page." Nothing in this post states that Defendant wanted anyone to "share" a threat, much less a "true threat," "to her fb page." That Defendant was not requesting anyone to "share" "true threats" to D.A. Welch's Facebook page is clear because both of these comments were made *before* Defendant's "then the death to her as well" comment and, therefore, could not have been written with any intent to convince anyone to "share" that post with D.A. Welch.

Although the State argued at trial that it did not need to prove any "true threat," and we have addressed all the State's arguments on appeal, we must conduct an independent review of the entire record to determine if the evidence presented at trial, considered in context, could support a finding of a "true threat." *Bose*, 466 U.S. at 505, 511, 80 L. Ed. 2d at 519, 523; *Bagdasarian*, 652 F.3d at 1118. This Court also reviews the record to determine whether the evidence could support a determination that Defendant *intended* the following: his posts would eventually get to D.A. Welch and, upon reading the posts, D.A. Welch would believe Defendant actually intended to kill her. *Bose*, 466 U.S. at 505, 511, 80 L. Ed. 2d at 519, 523.

The forum in which an alleged "true threat" was communicated is a primary contextual factor. *See Watts*, 394 U.S. at 707–08, 22 L. Ed. 2d at 666–67; *Bly*, 510 F.3d at 459. "This Court long ago recognized that members of the public retain strong free speech rights when they venture into public [spaces], which . . ., time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 172 L. Ed. 2d 853, 862 (2009) (quotation marks and citations omitted). "In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such 'traditional public fora.'" *Id.*; *see also Packingham*, 582 U.S. at __, 198 L. Ed. 2d at 279–80. The fact that Defendant's comment was posted on Facebook is of great importance to our "true threat" analysis. The Supreme Court has recognized:

> While in the past there may have been difficulty in identifying the most important places (in a spatial sense) for the exchange of views, today the answer is clear. It is cyberspace—the "vast democratic forums of the Internet" in general, and social media in particular. Seven in ten American adults use at least one Internet social networking service. One of the most popular of these sites is Facebook, the site used by petitioner leading to his conviction in this case. . . .
>
> Social media offers "relatively unlimited, low-cost capacity for communication of all kinds." On Facebook, for example, users can debate religion and politics with their friends and neighbors or share vacation photos. . . . In short, social media users employ . . . websites to engage in a wide array of protected First Amendment activity on topics "as diverse

as human thought."

*Id.* at __, 198 L. Ed. 2d at 280 (citations omitted).

Defendant was engaging in a heated discussion, or "debate," about a political concern with his Facebook friends, which was emotionally charged due to the content of the discussion, a dead child, as well as shared feelings, very likely incorrect, that D.A. Welch improperly declined to prosecute the parents. Facebook has the status of a "public square," but can feel like a "safer" place to discuss controversial topics or make inappropriate, hyperbolic, or boastful statements. The audience is generally known to the person posting, and there is often a sense of community and like-mindedness. The record evidence is that every response to Defendant's posts on Facebook was supportive of Defendant's comments. None of the responses on Facebook indicated concern that Defendant might be planning to kill D.A. Welch. By posting on Facebook, Defendant was expressing his feelings publicly, but selectively, in the "most important place[] . . . for the exchange of views." *Id.*

Courts also consider the "purpose" of the conversation within which an alleged threat was made. *See United States v. Landham*, 251 F.3d 1072, 1083–84 (6th Cir. 2001). One purpose of Defendant's comments was clearly to express his frustration about what he perceived as a great injustice, perhaps fueled in part by the six beers he estimated drinking. The purpose was also to solicit discussion about D.A. Welch's decision not to prosecute the parents, and to complain about local politicians, the lack

of "justice" in the area, and the "corruption" of the local "justice system" in general. Protection of the free flow of ideas and opinions of political concern is of particular importance in First Amendment cases, even, or even particularly, when the opinions represent a minority view, or are offensive to many people. *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667; *Bly*, 510 F.3d at 459. The "discussion" initiated by Defendant's first post was undoubtedly political speech, even if some of it was ill-advised, vituperative, and irresponsibly hyperbolic.

All of Defendant's comments, even the most disturbing, were directed toward a call for political change, or an expression of disdain for the political system. The alleged threats against D.A. Welch were completely intertwined with Defendant's political rants. It is general knowledge that Facebook, like many other sites on the Internet, often serves as a place where people air their grievances. Further, it is not uncommon for some of the posts on Facebook and other Internet platforms to be "over the top," exaggeratedly offensive, threatening, or irrational. *West v. G. D. Reddick, Inc.*, 302 N.C. 201, 203, 274 S.E.2d 221, 223 (1981) (citations omitted) ("[A] court may take judicial notice of a fact which is . . . so notoriously true as not to be the subject of reasonable dispute[.]").

A related consideration is whether the context in which the alleged threat was communicated is traditionally "an area often subject to impassioned language and hyperbole[.]" *Metzinger*, 456 S.W.3d at 97 ("Defendant's tweets facially reveal that

they were made in the context of sports rivalry, an area often subject to impassioned language and hyperbole."). Political speech on social media, or on the Internet in general, is undoubtedly one of the "areas" most "often subject to impassioned language and hyperbole[,]" or "'rhetorical excesses, and impotent expressions of anger or frustration[.]'" *Id.* (citation omitted). Defendant's posts "facially reveal that they were made in the context of [angry political speech], an area often subject to impassioned language and hyperbole." *Id.*

The specificity of the alleged threat is a consideration in "true threat" analysis. *See United States v. Callahan*, 702 F.2d 964, 966 (11th Cir. 1983) (citation omitted) (finding that a letter specifying time, date, and place of threatened assassination constituted a true threat). As well as being conditional and vague, the alleged threat, "If our head prosecutor won't do anything then the death to her as well[,]" lacked any specifics such at time, date, place, method, or other circumstances that would suggest Defendant was actually planning to kill D.A. Welch. The "she will be the first to go" comment was predicated on some future "rebellion against our government[,]" and does not even specify that Defendant personally intended to do *anything* to D.A. Welch if the "rebellion" actually came.

In addition, courts consider the reaction of those *not* the intended recipient who read the alleged threat. *Ross v. City of Jackson*, 897 F.3d 916, 922 n.6 (8th Cir. 2018); *Dinwiddie*, 76 F.3d at 925; *In re White*, 2013 WL 5295652 at *45. There were no

comments or posts in response to Defendant's posts that expressed any concern that Defendant was actually threatening to kill D.A. Welch or anyone else. All the online responses expressed support or agreement. Detective Stewart, whose reaction is discussed above, was the sole person concerned enough to take any action in response to Defendant's posts.

Courts also factor the defendant's explanation for having communicated the alleged threat, if any, and the defendant's actions following the posting of the alleged threat. *See Ross*, 897 F.3d at 922 n.6. As testified to by Detective Stewart and Agent Schick, Defendant deleted his posts shortly after making them. This action supports Defendant's statements to Agent Schick that "he wanted to apologize, because the last thing in the world he wanted to do is threaten to kill anybody[,]" that he "did not mean for the posts[,]" especially the "death to her" post, to come across as a threat to D.A. Welch, and that he did not want the posts to somehow reach D.A. Welch or the parents and upset them. Defendant asked Agent Schick "that if [he] saw [D.A. Welch], tell her I'm sorry and I did not mean it that way[.]" A person with an actual intent to threaten to kill someone is unlikely to delete the alleged threats within a couple of hours of posting them, and then politely ask a law enforcement officer to convey his apology to the alleged intended victim. Absent additional facts suggesting otherwise, Defendant's decision to delete the posts shortly after making them greatly diminishes the likelihood that a reasonable person who read the posts on Facebook

would construe them to contain any "true threat" to kill D.A. Welch. Defendant's act of deleting the posts is strong evidence that Defendant did not intend his posts to constitute a "true threat" to kill D.A. Welch. Although it was the State's burden, it presented no alternative theory for Defendant's decision to delete that conversation.

3. The State's Evidence Failed to Prove a "True Threat"

We hold that "[n]othing in Defendant's [posts] credibly suggested, either directly or indirectly, that Defendant was threatening violent acts that *were likely to occur*." *Metzinger*, 456 S.W.3d at 97–98 (emphasis added). The decision to prosecute Defendant may well have been made, at least in part, due to the State's belief that it could constitutionally convict Defendant pursuant to N.C.G.S. § 14-16.7(a) if it simply convinced the jury that the words Defendant wrote, *without considering any context*, could be interpreted as a threat; that Defendant knew the meaning of the words he wrote, and that Defendant willfully clicked the "post" button on his Facebook page. Conducting First Amendment "true threat" review, however, we hold, as a matter of law, that Defendant's Facebook posts did not rise to the level of a "true threat." Therefore, Defendant was unconstitutionally prosecuted pursuant to N.C.G.S. § 14-16.7(a) in this case. We would reach the same conclusion applying regular *de novo* review to answer this constitutional question. *Cooper v. Berger*, 370 N.C. 392, 413, 809 S.E.2d 98, 110–11 (2018). The statement "[i]f our head prosecutor won't do anything then the death to her as well," considered in context, is simply not a

statement that a reasonable person would understand as Defendant expressing a *serious intent to kill* D.A. Welch. Even if this were a close call, "[w]here the First Amendment is implicated, the tie goes to the speaker, not the censor." *Wis. Right To Life*, 551 U.S. at 474, 168 L. Ed. 2d at 349. We therefore vacate Defendant's conviction and remand to the trial court "for entry of a judgment of acquittal." *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 668; *Hanna*, 293 F.3d at 1087 (citations omitted) ("If it were clear, as a matter of law, that the speech in question was protected, we would be obligated to remand not for a new trial, but for a judgment of acquittal.").

4. The State's Evidence Failed to Prove Intent to Threaten

We further hold that the record evidence could not have supported a finding that Defendant's intent in posting his comments was to cause D.A. Welch to believe Defendant was going to kill her. *Bagdasarian*, 652 F.3d at 1118 ("[A] conviction under [an anti-threat statute] can be upheld only if both the objective and subjective requirements are met, . . . and our resolution of either issue may serve as an alternate holding."). If Defendant intended D.A. Welch to believe he was going to attempt to kill her, there were a number of methods that would have been just as easy, and more effective. The State would have to convince the jury beyond a reasonable doubt that Defendant, while cooking dinner for his wife and children, posted his Facebook comments with the intent that they would be perceived as a "true threat" to kill D.A. Welch; that Defendant did not care that anyone reading his alleged threats to kill

would immediately know his identity; that Defendant assumed at least one of his Facebook friends would share his posts with D.A. Welch so the "true threat" would reach his intended target; and that Defendant was unconcerned that his acts would likely result in his arrest and prosecution.

If Defendant truly desired to convey to D.A. Welch a "true threat" to kill her, and was not concerned about the likely consequences, he could have simply threatened D.A. Welch in person—at work or anywhere else; he could have left a written threat for her at her office, or mailed a threat there; or he could have attempted to send her a threatening message on Facebook directly.[24] The fact that Detective Sampson happened to see Defendant's posts, took screenshots before they were deleted, and alerted D.A. Welch, constituted a series of events unlikely to have been foreseen by Defendant. Further, if Defendant intended to threaten D.A. Welch, it is unlikely that he would have buried his intended threats among long, rambling diatribes against multiple people and government entities. It is also unlikely that language directed at people or groups Defendant did not intend to threaten would be much more direct and violent than the contingent, non-specific, and equivocal language he used for his supposed intended target, D.A. Welch. Further, if Defendant intended D.A. Welch to receive his comments and believe he was planning to kill her,

---

[24] Anyone with a Facebook account can send a personal message to another account holder unless they have been specifically "blocked." Although Defendant and D.A. Welch were not Facebook "friends," she would have had no reason to block Defendant until after she was alerted to his posts.

it is unlikely he would have attempted to send her an apology when he was informed his comments had, in fact, reached D.A. Welch. Considering all the attendant circumstances, particularly the alleged threats in the context of the entire Facebook "conversation" on Defendant's personal page, to which D.A. Welch did not have access, we hold that there was insufficient evidence to prove the element of specific intent to threaten as required by the First Amendment. For this reason, as well, we vacate Defendant's conviction and remand to the trial court "for entry of a judgment of acquittal." *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 668; *Hanna*, 293 F.3d at 1087.

## 5. Jury Instructions

Defendant requested the trial court instruct the jury that the State must prove Defendant communicated a "true threat"; that it instruct the jury on the definition of "true threat"; and that it instruct the jury on the appropriate standards of intent. The State argued against Defendant's requested instruction on the basis that neither "true threat" nor its intent requirements were elements of N.C.G.S. § 14-16.7(a). The trial court denied Defendant's requested instruction. We have already rejected the State's argument that it was the trial court's duty to make the "true threat" determination in the first instance. Making this determination was the sole province of the jury and, even then, only if Defendant's motions to dismiss had been properly denied; and they were not.

Neither the State nor the trial court demonstrated an understanding that "true threat" was a required element of N.C.G.S. § 14-16.7(a). At the charge conference, Defendant told the trial court: "So I'm asking that you instruct on true threats. I believe it's a correct statement of the law[,]" and stated: "When you look at this case, this is solely about speech[.]" Defendant argued "the only way a jury can render a verdict in this case is if they know what a true threat is and are instructed on it. Otherwise, they don't have the appropriate legal standard." Defendant requested the following instruction:

> In this context, you must find [] Defendant communicated a "true threat." A "[t]rue [t]hreat" is a statement where the speaker ([D]efendant) means to communicate a serious expression of intention to commit an act of unlawful violence to a particular individual (D.A. [Welch]), not merely "political hyperbole," vehement, caustic and sometimes unpleasantly sharp attacks, or vituperative, abusive and inexact statements." The [D]efendant must intend to [have] communicate[d] a "[t]rue [t]hreat" to the D.A.

Defendant's requested instruction was a generally correct statement of the law and it was error for the trial court to refuse to give it, or a differently worded instruction that correctly stated all the elements that the State was required to prove and the jury was required to determine. When asked to respond to Defendant's requested instructions, the State answered: "The State would object to all these instructions[.] The pattern jury instructions are clear that *there are three and only three elements to this charge.* Now *with regards to the threat,* the *only* element is that the defendant

knowingly and willfully made a threat to kill the victim." (Emphasis added). The

State further argued that the First Amendment did not apply to Defendant's case:

> I get that the defendant is raising First Amendment
> objections to that statute as it's written, but I think the
> proper venue to take that up would be if upon conviction to
> take that up on appeal.
>
> What he's asking the Court to do is rewrite the North
> Carolina statute to comport with his interpretation of the
> First Amendment requirements.
>
> Under the misdemeanor communicating threats statute,
> the North Carolina legislature specifically put in an
> element, "the threat is made in a manner and under
> circumstances which would cause a reasonable person to
> believe the threat is likely to be carried out."
>
> The same legislature specifically exempted that element
> from this crime. Therefore, it is the legislature's intent
> . . . that there be *no requirement of proof to show that the*
> *threat was made in a manner and under circumstances*
> *which would cause a reasonable person to believe it is likely*
> *to be carried out*.
>
> I think it can be inferred that the legislature felt that
> *making any threats* towards . . . court officials . . . is
> unacceptable to the legislature, *regardless of whether they*
> *were made in a manner that a reasonable person would*
> *believe they would be carried out*. They specifically
> exempted that element from this statute that exists in the
> other threat statute, and I think it would be inappropriate
> to reinsert it back in.

(Emphasis added). Following the State's argument, the trial court ruled against

Defendant. The State's argument was in direct conflict with the general intent

standards applied by *every* jurisdiction we have found, as well as the specific intent

requirement we have adopted in this opinion. *White II*, 810 F.3d at 219 (citation omitted) (under the universally accepted general intent standard, the State had the burden of proving Defendant's posts were such that "a reasonable [person] . . . familiar with the circumstances would interpret [them] as a serious expression of [Defendant's] intent to" kill D.A. Welch).

Compounding the error, the State argued context to demonstrate Defendant's "state of mind," even though it had erroneously informed the jury that the context surrounding Defendant's posting of the comments, as well as Defendant's intent, was irrelevant to the jury's decision. In its closing argument, the State told the jury that under N.C.G.S. § 14-16.7(a), to prove Defendant "willfully made a threat to kill" D.A. Welch, the State was only required to prove that words included in Defendant's post could interpreted as a "threat," without any definition of what a "threat" entailed; that Defendant understood the meaning of the words;[25] and that Defendant intended to post those words. The State did not believe it was required to prove Defendant communicated any "true threat," and told the jurors they would be acting contrary to the law "if you add [an intent] element in there, if you go back to the room and say well, we're going to give consideration to whether he meant to follow through on it or not[.]" However, not only was the State required to prove the general and specific intent elements required by the First Amendment, a defendant's intent to carry out

---

[25] *I.e.*, that Defendant understood English.

a threat is also relevant because "[a] person who says he is going to bomb a building is more likely to give the impression he is serious if he actually *is* serious." *United States v. Parr*, 545 F.3d 491, 498 (7th Cir. 2008). The State further argued that it did not matter if Defendant "was venting or not. You cannot threaten court officials[,]" in other words, that Defendant's state of mind was irrelevant. This was a clear misstatement of the law. *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667 ("But whatever the 'willfullness' requirement implies, the statute initially requires the Government to prove a true 'threat.' We do not believe that the kind of political hyperbole indulged in by petitioner fits within that statutory term."). However, the State then argued the following to the jury, using posts not contained in the indictment in order to demonstrate Defendant's "violent" state of mind:

> "When the deputy asks me if it was worth it, I would say with a shot gun pointed at him and an AR-15 in the other arm was it worth it to him. I would open every gun I had." This shows his frame of mind as he's posting it. *This is not about [D.A. Welch], but he's talking about what he's going to do when law enforcement comes to his house. This shows his frame of mind as he's making these posts.* You saw somebody else named [] Burch then jumped into the conversation, and what [] Burch posted was, "Vigilante justice." And then the defendant comes back and says, "If that's what it takes."

(Emphasis added).

Without instructing the jurors that they were required to consider the alleged threats in context, and that they were required to apply the appropriate intent

standards, the jury was free to find Defendant guilty without having made a

determination that any of Defendant's posts were "true threats." *Id.*; *Harte-Hanks*,

491 U.S. at 668, 105 L. Ed. 2d at 577 (citations omitted) (stating that, for the "actual

malice" inquiry, "a plaintiff is entitled to prove the defendant's state of mind through

circumstantial evidence, and it cannot be said that evidence concerning motive or

care never bears any relation to the actual malice inquiry").  The State also argued

in its closing:

> Now in *voir dire* and opening arguments [D]efendant
> talked about the defense was speech.  It's our position that
> this crosses the line.  Yes, one of the great hallmarks of this
> country is our right to free speech.  But we all know that
> free speech crosses a line at some point.  And when the free
> speech crosses the line to *venting your frustration about
> government*, it crosses the line into *putting her in fear* of
> her life, that's when the law steps in.  And *that's not free
> speech*.  That's when you've gone too far.

(Emphasis added).  Assuming the State did not mean to suggest that "venting your

frustration about the government" "crosses the line," it still argued erroneous First

Amendment law to the jury when it stated that any Facebook post that "put[] [D.A.

Welch] in fear of her life" "crossed the line" and rendered Defendant's speech

"unprotected" by the First Amendment.  No "true threat" standard is met solely by

proving the subjective reaction of the intended recipient to the alleged threat.[26]  The

State told the jurors:  "You cannot threaten court officials[,]" and "Did [Defendant]

---

[26] On appeal, the State acknowledges:  "As a constitutional matter, intent for the victim to feel fear is not a necessary ingredient for a true threat."  (Citations omitted).

intend on grabbing a gun and getting into his car, driving over to [D.A. Welch's] house that night and shooting her?  Doesn't matter.  He posted a threat.  He knew it was a threat."  Both the State and the trial court mistakenly understood N.C.G.S. § 14-16.7(a) to proscribe *any* statement that could be read as a "threat" to kill a court officer.  The trial court rejected Defendant's proposed instruction on "true threat," and instead instructed the jury that it only had to find:

> [D]efendant knowingly and willfully made a threat to kill [D.A. Welch].  A person acts "knowingly" when the person is aware or conscious of what he is doing.  A person acts "willfully" when the act was done intentionally.  Intent is a mental attitude seldom provable by direct evidence.  It must ordinarily be proved by circumstances from which it may be inferred.  You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom.[27]

The First Amendment required more.  *See, e.g., United States v. Gaudin*, 515 U.S. 506, 509–15, 132 L. Ed. 2d 444, 449–53 (1995).

There is no evidence to suggest the requirements of the First Amendment were applied to Defendant's case at any point in the process.  In a criminal jury trial, *every element* of the crime *must* be submitted to the jury.  *Apprendi*, 530 U.S. at 476–77, 147 L. Ed. 2d at 447.  Defendant "cannot stand convicted unless and until a jury *acting under proper instructions* finds from what [Defendant] said that indeed he did

---

[27] This "intent" instruction included in the charge only applied to whether Defendant willfully, *i.e.*, intentionally, posted the words he wrote on Facebook.

make a[] [true] threat." *Alexander*, 418 F.2d at 1207 (emphasis added). The trial was conducted without the understanding that "whatever the 'willfullness' requirement implies, the [anti-threat] statute initially require[d] the [State] to prove a true 'threat[,]'" *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667, and that "all threat statutes[] 'must be interpreted with the commands of the First Amendment clearly in mind.' Thus, such statutes apply only to 'true threat[s]'—i.e., threats outside the protective scope of the First Amendment." *Wheeler*, 776 F.3d at 742–43 (citations omitted). The instruction given did not include the First Amendment requirements that were included in Defendant's requested instruction: (1) that it was the State's burden to prove beyond a reasonable doubt the element that Defendant communicated a "true threat" to kill D.A. Welch; (2) that a "true threat" is a statement "where the speaker [Defendant] means to communicate a serious expression of an intent to commit an act of unlawful violence [murder] to a particular individual [D.A. Welch,]" *Black*, 538 U.S. at 359, 155 L. Ed. 2d at 552, not merely "political hyperbole," "vehement, caustic and sometimes unpleasantly sharp attacks[,]" or "vituperative, abusive and inexact statements," *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 667; (3) that "the prosecution must show that an ordinary, reasonable [person] who is familiar with the context in which the statement [wa]s made would interpret it as a serious expression of an intent to" kill D.A. Welch, *White II*, 810 F.3d at 221; and (4) that "speech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that

the speaker subjectively intended the speech as a threat[,]" which the State must prove beyond a reasonable doubt, considering the relevant context.  *Cassel*, 408 F.3d at 632–33.

The "true threat" inquiry requires "'delicate assessments of the inferences a "reasonable [decision-maker]" would draw from a given set of facts and the significance of those inferences to him[,]'" and this decision "'[is] peculiarly on[e] for the trier of fact.'"  *Gaudin*, 515 U.S. at 512, 132 L. Ed. 2d at 451 (citations omitted).  Because "true threat" is a necessary element of N.C.G.S. § 14-16.7(a), determination of that element by the jury was a *constitutional requirement*, not, as argued by the State, an issue for the trial court to decide.  *Apprendi*, 530 U.S. at 476–77, 147 L. Ed. 2d at 447.  "[The defendant] was entitled to have the issue as to whether his statements constituted a [true] 'threat' properly submitted to the jury.  It follows that if the evidence suggested inquiries for the jury on that issue which the charge erroneously foreclosed, [the defendant] must have a new trial."  *Alexander*, 418 F.2d at 1206 (footnote omitted); *see also id.* (emphasis added) ("[T]he charge did not mention *the necessity*, in determining whether a [true] threat was made, *of examining the statement in its full context*.").  Due to the failure to properly instruct the jury on constitutionally required elements, N.C.G.S. § 14-16.7(a) was unconstitutionally applied to Defendant.

Having found constitutional error in the jury instruction given at Defendant's trial, we must conduct harmless error analysis:

> A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless.

*State v. Ortiz-Zape*, 367 N.C. 1, 13, 743 S.E.2d 156, 164 (2013) (citing N.C.G.S. § 15A-1443(b) (2011)). The State attempts to shift this burden to Defendant and, therefore, does not make any argument that the failure to properly instruct the jury was harmless beyond a reasonable doubt. Because the State does not make the required argument, it has failed in its burden. *Id.*; N.C.G.S. § 15A-1443(b) (2017).

Instead, the State argues: "Even if [Defendant's] posts were protected speech, his conviction would still survive scrutiny under the First Amendment." The State seems to be conflating Defendant's as-applied "true threat" challenge with a facial challenge, arguing: "The State may regulate speech, even through content-discriminatory means, so long as the State's means are narrowly tailored to serve a compelling interest." (Citing *Hest Techs,* 366 N.C. at 298, 749 S.E.2d at 436). However, "[t]he fact that [a law] is capable of valid applications does not necessarily mean that it is valid as applied[.]" *Taxpayers for Vincent*, 466 U.S. at 803 n.22, 80 L. Ed. 2d at 785 n.22. The State requests this Court to apply strict-scrutiny review "to [Defendant's] conduct" and find that his "conviction under the threats statute is

narrowly tailored to serve the State's interest in maintaining a stable government[.]" Because Defendant has not made a facial challenge to N.C.G.S. § 14-16.7(a), we do not consider whether the statute would survive strict scrutiny review. Further, we hold that the State would be unable, on the facts before us, to prove the error harmless beyond a reasonable doubt. *Id.*

## IV. Conclusion

We hold, upon *Bose* independent whole record review, that Defendant's conviction was obtained through the unconstitutional application of N.C.G.S. § 14-16.7(a) in his prosecution. Initially, we hold Defendant's posts were not "true threats" as a matter of law and, therefore, the State could not prove any violation of N.C.G.S. § 14-16.7(a). For this reason, we vacate Defendant's conviction and remand to the trial court "for entry of a judgment of acquittal." *Watts*, 394 U.S. at 708, 22 L. Ed. 2d at 668; *Hanna*, 293 F.3d at 1087. As a separate and distinct basis for vacating Defendant's conviction and remanding for entry of a judgment of acquittal, we also hold that the evidence was insufficient to meet the element of specific intent, that when Defendant posted the comments on Facebook his intent was that they would reach D.A. Welch and that she would believe Defendant was actually planning to kill her. *Bagdasarian*, 652 F.3d at 1118. In the event our Supreme Court determines that *Bose* independent whole record review will not be used in North Carolina for First Amendment "true threat" appeals, we also hold that we would reach the same

results pursuant to our regular standard of appellate review. Finally, in the event our holdings that Defendant's conviction should be vacated and remanded for entry of a judgment of acquittal are not upheld, we also hold that the trial court's failure to properly instruct the jury on all essential elements of N.C.G.S. § 14-16.7(a), *i.e.*, its failure to instruct the jury on the "true threat" and intent elements required by the First Amendment, constituted prejudicial error requiring reversal of Defendant's conviction and remand for a new trial.

Because we are dealing with issues of first impression in North Carolina, we were required to make additional holdings in order to reach the resolution of this matter. In this opinion, we have held the following concerning application of the First Amendment to anti-threat statutes in North Carolina: (1) The First Amendment requires that "true threat" *must* be included as an *element* of any prosecution based upon an alleged threat. The "true threat" element includes a proper definition of "true threat" and application of the general intent standard set forth above. (2) Whether considered part of the definition of "true threat" or a separate element, the First Amendment requires the State to prove beyond a reasonable doubt that a defendant specifically intended that his communication would reach the intended target, and that the defendant also intended his target would believe the communication to be a real threat and feel threatened thereby. (3) It is the State's burden to prove a defendant communicated a "true threat" based on the language and

nature of the alleged threat itself and all the relevant attendant circumstances, *i.e.*, context. If challenged, it is also the State's duty to prove that an anti-threat statute can be constitutionally applied, based upon the particular facts of each case. (4) Regardless of whether "true threat" is labeled fact, law, or a combination thereof, it is a "constitutional fact," and is generally a question for the jury, or the trial court acting as the trier of fact, to decide in the first instance, unless the State's evidence is insufficient to prove a "true threat" as a matter of law, in which case the trial court should dismiss the charge upon a defendant's motion. (5) Because the jury determines whether the State has proven a communication constitutes a "true threat" in the first instance, the jurors *must be instructed* in such a manner that they understand the definition of "true threat," the correct intent standards and how to apply them, and the requirement that they consider the alleged threat in context, that is, considering all the relevant circumstances surrounding the communication of the alleged threat, including relevant circumstances both preceding and following communication of the alleged threat. (6) We follow the Supreme Court and the majority of federal jurisdictions in holding "the rule of independent review assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the fact[-]finding function be performed in the particular case by a jury or by a trial judge." *Bose*, 466 U.S. at 501, 80 L. Ed. 2d at 516–17; *id.* at 502, 80 L. Ed. 2d at 517. Independent whole record appellate review must ensure that "the speech in

question actually falls within the unprotected category and [is] confine[d to] the perimeters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited." *Id.* at 505, 80 L. Ed. 2d at 519.

VACATED.

Judge ZACHARY concurs.

Judge DIETZ concurs in part in a separate opinion.

DIETZ, Judge, concurring.

I concur in Part III.A.3 of the majority opinion. After a night of drinking, David Taylor took to Facebook and unleashed his frustration at the local district attorney, who had declined to bring charges in the death of a toddler.

The only portion of Taylor's rambling series of Facebook posts that plausibly could be considered a threat against the district attorney is his statement that "If our head prosecutor won't do anything, then death to her as well."

Even in isolation, this statement is not necessarily a "true threat." In modern English language, calling for "death to" something quite often is *not* a threat to kill that thing—it often expresses a desire for the downfall or ruin of that thing.

We know this not only for English usage generally, but from Taylor's own usage in this same series of Facebook posts. Shortly before his "death to her as well" comment, Taylor stated, "Death to our so called judicial system since it only works for those that are guilty!"

Moreover, Taylor's statement was conditional, just like the statement by Robert Watts in the landmark case establishing the true threat doctrine. *Watts v. United States.*, 394 U.S. 705, 708 (1969). Watts said, "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J." *Id.* at 706. Likewise, Taylor said *if* the district attorney did not change her charging decision concerning the toddler's death—which Taylor viewed as a political one—then "death to her as well."

The conditional nature of this threat reduces the sort of immediacy needed to satisfy the Supreme Court's definition of a true threat.

Finally, we cannot look at Taylor's statement in isolation. It was part of a lengthy invective—some of it crude and offensive, some of it rather poetic—that expressed Taylor's lack of faith in the government and the justice system. He complained that he had "voted for it to change and apparently it never will." He repeatedly questioned whether the government would protect his rights and suggested that he may need to take up arms to defend himself. And he complained specifically about the district attorney, speculating that "She won't try a case unless it gets her tv time. Typical politician."

In this context, Taylor's purported threat was "political hyperbole" expressing his distrust in politicians, the justice system, and the government. *Id.* at 708. Indeed, even his statement following "death to her as well," in which he explained "Yea I said it. Now raid my house for communicating threats and see what they meet," carries this meaning. Taylor had so little faith in his own government that he *expected* to be arrested for criticizing public officials, even though he had a constitutional right to do so.

The advent of social media has given us a window into our fellow citizens' views that we did not have before. Drunken political tirades like Taylor's once were confined to living rooms or pool halls. They now can be seen by everyone, everywhere. The

First Amendment protects them either way. Taylor's rant was not a true threat—it was "a kind of very crude offensive method of stating a political opposition to" the district attorney. *Id.* His speech is protected by the First Amendment and cannot be criminalized. I therefore concur in the decision to reverse Taylor's criminal conviction.